# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEW MEXICO

UNITED STATES OF AMERICA,

       Plaintiff,

vs.                                    No. CR 05-1604 JB

ARTHUR BEN PESHLAKAI,

       Defendant.

## MEMORANDUM OPINION AND ORDER

**THIS MATTER** comes before the Court on the Defendant's Sentencing Memorandum, filed Sept. 20, 2007 (Doc. 92).  The Court held an evidentiary sentencing hearing on October 16, 2007. The primary issues are: (i) whether the Court should sustain Defendant Arthur Ben Peshlakai's objections to paragraph 12, of the original Pre-Sentence Investigation Report ("Original PSR"), disclosed Sept. 10, 2007, because it implies that he has not given his version of events; (ii) whether the Court should sustain Peshlakai's  "double counting" objections to the PSR's overall calculation of his offensive level based upon: (a) U.S.S.G. § 2A3.1(b)(1), which allows a 4-level increase based on use of force in offenses involving the conduct described in 18 U.S.C. § 2241(a); (b) U.S.S.G. § 2A3.1(b)(4)(B), which allows a 2-level increase if "serious bodily injury" occurred, and 1B1.1, application note L, which deems "serious bodily injury" to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. 2241; and (c) U.S.S.G. § 2A3.1(b)(5), which increases the offense level by 4 if the victim was abducted; and (iii) whether the Court should sustain Peshlakai's objections to the PSR's calculation of his criminal history points.  The Court will sustain in part and overrule  in part the objections in Peshlakai's Sentencing Memorandum.  The Court overrules Peshlakai's objections to ¶ 12 of the PSR as as moot.  The Court overrules

Peshlakai's objections to the PSR's enhancement of his criminal offense level under U.S.S.G. § 2A3.1, because there is no dispute that force was used in the commission of the crime and a 4-level increase is required when the defendant is convicted of aggravated sexual abuse.  Peshlakai's objection to the enhancement using U.S.S.G. §§ 2A3.1 and 1B1.1, cmt. app. n.(1)(L) is sustained. Although the Court recognizes that psychological and physical injury to the victim occurred, those harms arise directly from Peshlakai's aggravated sexual abuse of her, and not from conduct aside from the criminal sexual abuse itself, so the requirements for enhancement for serious bodily injury are not met.  The Court overrules Peshlakai's objection to enhancement based upon 2A3.1(b)(5), and 1B1.1, cmt., app. n.1(A), because he abducted the victim by forcing her to a different location to perpetrate the aggravated sexual abuse. The Court overrules Peshlakai's objection to ¶ 34 of the PSR, because the sentence in the Shoplifting case is countable, even though it was an uncounseled misdemeanor, because no term of imprisonment was imposed as part of the sentence.   The Court also overrules Peshlakai's objection to ¶ 36 of the PSR as moot.  The Court overrules Peshlakai's objection to ¶ 42 of the PSR, because no limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense that a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.

## FINDINGS OF FACT

Rule 32(i)(3)(B) of the Federal Rules of Criminal Procedure states that the Court "must -- for any disputed portion of the presentence report or other controverted matter -- rule on the dispute or determine that a ruling is unnecessary either because the matter will not affect sentencing, or because the court will not consider the matter in sentencing. . . ." Fed. R. Crim. P. 32(i)(3)(B).  The findings of fact in this Memorandum Opinion and Order shall serve as the Court's essential findings for purposes of rule 32(i)(3)(B).  In making these findings, the rules of evidence do not bind the

Court.  See Fed. R. Evid. 1101(d)(3); United States v. Graham, 413 F.3d 1211, 1221 n. 10 (10th Cir. 2005)("In any event, the Federal Rules of Evidence are not applicable to sentencing proceedings.")(citing Fed.R.Evid. 1101(d)(3)).

### A.   ABDUCTION

1.      The incidents occurred in June of 2005.  See Transcript of Hearing ("Tr.") (taken Oct. 16, 2007) at 15:12-15 (Spiers & Sandra T.).[1]

2.      Peshlakai was drunk before he and Sandra T. left the Anasazi Bar in Farmington, New Mexico.  See Tr. at 39:13, id. at 40:14-19 (Peshlakai.).

3.      Peshlakai was "beyond buzzed."  Tr. at 40:19 (Peshlakai).

4.      When he sat down at a stool, he "happened to see" Sandra T. right next to him. Tr. at 39:16-17 (Peshlakai).

5.      Peshlakai saw Sandra T. and her friend singing karaoke.  See Tr. at 39:20-22 (Peshlakai).

6.      Peshlakai "told her she had a beautiful voice . . . that's how our conversation started." Tr. at 39:22-23 (Peshlakai).

7.      Sandra T. gave Peshlakai a drink purchased for her by a man that her friend was talking to.  See Tr. at 28:9-10 (Sandra T.).

8.      Sandra T. was not drinking that night because she was driving, so she gave her drink to Peshlakai.  See Tr. at 28:10-11 (Sandra T.).

9.      Sandra T. decided to leave after her friend went to her boyfriend's motel room and did not return after about 30 minutes.  See Tr. at 29:18-21 (Aarons & Sandra T.).

---

[1] The Court's citations to the transcript of the hearing refer to the Court Reporter's original, unedited version.  Any final transcript may contain slightly different page and/or line numbers.

10.     While Sandra T. was waiting for her friend to return from her boyfriend's motel room, she saw Peshlakai come out of the bar.  See Tr. at 29:21-22 (Sandra T.).

11.     Peshlakai told her that his truck had been stolen.  See Tr. at 29:23 (Sandra T.).

12.     Peshlakai asked Sandra T. for a ride home, because his vehicle was stolen.  See Tr. at 15:18-20 (Sandra T & Spiers), id. at 23:20-21 (Sandra T.), id. at 42:2-3 (Peshlakai).

13.     Sandra T. agreed to give him a ride home.  See Tr. at 23:22-23 (Sandra T.).

14.     Sandra T. gave him a ride, because she is a nice person and she will help somebody if he or she needs help.  See Tr. at 30:14-20 (Aarons & Sandra T.).

15.     As Sandra T. and Peshlakai began to drive to the Shiprock area, Peshlakai told her that he lived on a dirt road between Shiprock and Gallup.  See Tr. at 23:24-24:1 (Sandra T.).

16.     Sandra T. began to drive and follow Peshlakai's directions.  See Tr. at 24:1-2 (Sandra T.).

17.     Sandra T. believed that everything was going to be okay, because she saw houses. See Tr. at 24:2-3 (Sandra T.).

18.     Peshlakai woke up 30 miles east of Shiprock in his "hometown." Tr. at 42:7-11 (Peshlakai & Aarons).

19.     As they were driving, Peshlakai kept telling Sandra T. to drive a little bit further.  See Tr. at 24:4-5 (Sandra T.).

20.     Peshlakai went to sleep as they drove towards the Navajo Nation.  See Tr. at 31:2-4 (Aarons & Sandra T.).

21.     Peshlakai thinks he may have passed out from drinking and smoking too much.  See Tr. at 42:7-8 (Peshlakai).

22.     Peshlakai asked her to stop so that he could use the bathroom. See Tr. at 24:7-8

-4-

(Sandra T.).

23.     When she stopped the car, Peshlakai grabbed the keys out of her ignition.  <u>See</u> Tr. at 24:8-9 (Sandra T.).

24.     When she tried to get the keys back from him, she could not get him to open his
        fingers.

<u>See</u> Tr. at 24:10 (Sandra T.).

25.     Peshlakai told Sandra T: "Do what I say.  If you do what I say, then I won't hurt you. If you do what I say.  Do what I say."  Tr. at 24:11-13 (Sandra T.).

26.     After Peshlakai had Sandra T.'s car keys, they began fighting.  <u>See</u> Tr. at 24:14-15 (Sandra T.).

27.     Peshlakai then pushed Sandra T. to the ground.  <u>See</u> Tr. at 24:14-15 (Sandra T.).

28.     When the car alarm went off on Sandra T.'s vehicle, Peshlakai gave her back the keys to her car. <u>See</u> Tr. at 24:17-18 (Sandra T.).

29.     Sandra T. tried to leave, but that "just didn't work."  Tr. at 24:19-20 (Sandra T.).

30.     Peshlakai was holding on to the steering wheel as she pressed on the gas, so they were "going all over the place."  Tr. at 24:20-22, 33:19-21 (Sandra T.).

31.     Sandra T. and Peshlakai then fought more.  <u>See</u> Tr. at 24:23 (Sandra T.).

32.     Every time Sandra T. would try to run and get away, Peshlakai would tackle her. <u>See</u> Tr. at 24:23-24 (Sandra T.).

33.     Peshlakai was hitting her in the head as she lay down on the ground on her stomach. <u>See</u> Tr. at 24:25-25:1-2 (Sandra T.).

34.     Sandra T. told Peshlakai: "I'll do whatever you want.  Tell me what you want me to do.  I'll do whatever you want, just don't hit me any more."  Tr. at 25:2-4 (Sandra T.).

35.     They got back in her car, and Peshlakai gave her the car keys.  See Tr. at 25:12-13 (Sandra T.).

36.     They drove towards the main road and up on a hill.  See Tr. at 25:13-14 (Sandra T.).

37.     Peshlakai admits that Sandra T. drove to the remote location on the top of the hill because he told her to do it.  See Tr. at 63:10-18 (Spiers & Peshlakai).

38.     Peshlakai told Sandra T.: "Right there."  Tr. at 25:14 (Sandra T.).

39.     Initially, they passed the spot where Peshlakai wanted Sandra T. to stop, and she had to back her car to it.  See Tr. at 25:14-15 (Sandra T.).

40.     Peshlakai told Sandra T.: "Stop right there.  Stop right there.  Pull in right there."  Tr. at 25:15-16 (Sandra T.).

41.     The area into which Sandra T. pulled is a dirt road cut off by a fence.  See Tr. at 25:17-18 (Sandra T.).

42.     At that point, Peshlakai told Sandra T. to get into the backseat.  See Tr. at 25:18-19 (Sandra T.).

43.     That location is where Peshlakai sexually abused her.  See Tr. at 25:20-21 (Sandra T.).

44.     Sandra T. would not have driven up that hill and parked there if Peshlakai had not told her to do so.  See Tr. at 25:22-24 (Spiers & Sandra T.).

45.     Sandra T. did what Peshlakai told her to do because she did not want to be beaten anymore and did not know what was going to happen to her.  See Tr. at 26:2-3 (Sandra T.).

46.     After the rape, Sandra T. asked Peshlakai for the car keys, and he gave them back, but Sandra T. could not get him physically out of her car.  See Tr. at 35:15-17 (Sandra T.).

47.     Sandra T. states that all she wanted to do was return to the Shiprock area.  See Tr.

at 35:17-18 (Sandra T.).

48.     Sandra T. told Peshlakai: "I promise I'm not going to tell.  Please let me go.  I don't even know who you are."  Tr. at 36:10-12 (Sandra T.).

49.     After the rape, Sandra T. drove Peshlakai home.  See Tr. at 36:14 (Sandra T.), id. at 44:22-23 (Peshlakai).

50.     Sandra T. tried to run over Peshlakai's shoulder with her car while he was underneath it.  See Tr. at 44:7-9 (Peshlakai).[2]

**B.     SERIOUS BODILY INJURY**

51.     Every time Sandra T. would try to run and get away, Peshlakai would tackle her. See Tr. at 24:23-24 (Sandra T.).

52.     Peshlakai was hitting her in the head as she lay down on the ground on her stomach. See Tr. at 24:25-25:1-2 (Sandra T.).

53.     Peshlakai pushed Sandra T. to the ground.  See Tr. at 24:15-16 (Sandra T.).

54.     Peshlakai removed her clothing.  See Tr. 16:21-22 (Sandra T.).

55.     Peshlakai tore her shirt off of her.  See Tr. at 22-23 (Sandra T.).

56.     During the attack, Peshlakai hit, kicked, and elbowed Sandra T.   See Tr. at 14:3 (Sandra T. & Spiers), id. at 15:16-21 (Sandra T. & Spiers).

57.     Peshlakai kicked her on her back and side, and hit her in the face with his elbow. See Tr. at 15:23-25 (Sandra T.).

58.     While Sandra T. was laying on her stomach, Peshlakai hit her in the back of her head around six times with his closed fist.  See Tr. at 16:1-4 (Sandra T.).

---

[2]Because the Court does not believe this fact is relevant to the issues that Peshlakai's Sentencing Memorandum presents, the Court does not see any need to address it.

59.     Peshlakai admits he hit Sandra T. with his fists as she described.  See Tr. at 60:20-21 (Spiers & Peshlakai).

60.     While Peshlakai hit Sandra T. in the back of her head, she saw white light flashes. See Tr. at 16: 9-11 (Sandra T.).

61.     Sandra T. had no idea what was going to happen and if she was going to make it home.  See Tr. at 16:12-14 (Sandra T.).

62.     At one point, Sandra T. was face-down, unclothed except the top part of her shirt, on a rocky surface.  See Tr. at 16:19-17:1 (Sandra T. & Spiers).

63.     The pain Sandra T. felt was mainly from the physical blows to her side, head, and elbowing from Peshlakai. See Tr. at 17:24-25 (Sandra T.).

64.     She also had a lot of bruises, scratches, and soreness from the rape that was the same soreness from being in a car accident.  See Tr. at 18:3-9 (Sandra T.).

65.     On a scale between one and ten, the pain Sandra T. experienced from Peshlakai hitting her was about an eight.  See Tr. at 18:18-25 (Spiers & Sandra T.).

66.     Peshlakai also hit Sandra T. in the jaw with his elbow.  See 19:21-25 (Spiers and Sandra T.).

67.     Peshlakai admitted that him inserting his penis inside Sandra T. would hurt her. See Tr. at 61:1-3 (Spiers & Peshlakai ).

68.     He also admitted that Sandra T. would feel violated and disgusted by that action. See Tr. at 61:4-7 (Spiers & Peshlakai).

69.     During the attack, Peshlakai inserted more than one finger into Sandra T., which was painful to her.  See Tr. at 18:14-15 (Sandra T.).

70.     Sandra T. asked Peshlakai to remove his fingers.  See Tr. at 18:15-16 (Sandra T.).

-8-

71.     Sandra T. compared the pain of the rape to the labor pains in giving birth. See 20:25-21:9 (Spiers & Sandra T.).

72.     During the attack, Sandra T. fell in an arroyo when she was trying to run away because it was dark and she did not see it.  See Tr. at 31:9-10 (Sandra T.).

73.     After the attack, Sandra T. went to a police station, but would not get out of her car, because she did not have any clothes on and did not see anyone walking around outside.  See Tr. at 21:14-16 (Sandra T.).

74.     Sandra T. drove to the hospital and waited for someone to come out to help her. See Tr. at 21:16-17 (Sandra T.).

75.     Sandra T. reports that, as she drove to the hospital to be examined, she was hurt, physically in pain, and cried.  See Tr. at 36:17-18 (Sandra T.).

76.     During the examination, Sandra T. was told that there was tearing inside her.  See Tr. at 18:16-17 (Sandra T.).

77.     Sandra T. talked with Peshlakai about her children during the attack. See Tr. at 26:4 (Sandra T.).

78.     Sandra T. reports she has suffered mentally.  See Tr. at 22:6-10 (Spiers & Sandra T.).

79.     She has been seeing a therapist, has been on medication, and has taken sleeping pills because she cannot sleep.  See Tr. at 22:8-10 (Sandra T.).

80.     Sandra T. feels that she has lost her family, her husband, and that her children no longer respect her.  See Tr. at 22:14-15 (Sandra T.).

81.     Sandra T.'s therapist has told her that she is suffering from posttraumatic stress.  See Tr. at 22:15-17 (Sandra T.).

82.     Sandra T. feels like the rape just recently happened, even though it was over a year

ago.  See Tr. at 22:17-221 (Sandra T. & Spiers).

83.    Sandra T. has difficulty sleeping, and gets up around four times per night.  See Tr. at 22:22-24 (Spiers & Sandra T.).

84.    She gets very scared when she hears noises because she now lives alone.  See Tr. at 22:24-25 (Sandra T.).

85.    Even when Sandra T. takes sleeping pills, she still gets up in the middle of the night and walks around to make sure nobody is in her house.  See Tr. at 23:1-2 (Sandra T.).

86.    Sandra T. reports that she can no longer sleep comfortably.  See Tr. at 23:3-4 (Sandra T.).

87.    She tries to keep herself busy, and if she keeps busy, she does not think about the rape as much.  See Tr. 23:7-8 (Sandra T.).

88.    Sandra T. is trying to forget the rape and move on, but it is very, very hard for her. See Tr. at 23:8-9 (Sandra T.).

89.    Sandra T. reports that she is still in therapy.  See Tr. at 37:5 (Sandra T.).

90.    Sandra T. states that the rape is affecting her whole life.  See Tr. at 37:6-7 (Sandra T.).    91.    Both Sandra T. and Peshlakai were credible in their testimony during the evidentiary hearing. Peshlakai's recollections regarding the circumstances and events surrounding the rape was, however, atemporal and difficult to understand at times, either because of how intoxicated Peshlakai was, see Tr at 39:13(Peshlakai), id. at 40:14-19 (Peshlakai), or because of the manner by which the testimony was elicited.  Thus, the Court finds Sandra T.'s testimony more reliable than Peshlakai's when there is any inconsistency between them.

**FACTUAL BACKGROUND**

At the sentencing hearing, Peshlakai confirmed that he did not have objections to the PSR

other than what is contained in his sentencing memorandum.  See Tr. at 4:22-25 (Aarons).  Thus, the Court will rely on the re-disclosed PSR for most of its factual background and findings.  The Court will discuss only the factual background needed to address Peshlakai's objections.

### A.     SHOPLIFTING CASE.

On November 16, 2001, in San Juan County Magistrate Court Case No. MR2001-596, Peshlakai was arrested for Shoplifting.  See PSR ¶ 34, at 9.  On December 20, 2001, a bench warrant for Failure to Appear was issued.  See id.  Peshlakai was arrested on April 22, 2002, on the bench warrant for the Failure to Appear.  See id.; Addendum, at 1.  The arrest for Failure to Appear occurred before, and was not a part of, the sentence imposed in the Shoplifting case.  See id.

On April 24, 2002, Peshlakai pled guilty to the charge of Shoplifting and was assessed $151.00 in a fine, fees, and court costs.  See id.  No conditional discharge was ordered in the Shoplifting case.  See id.

On September 24, 2007, the United States Probation Office contacted the San Juan Magistrate Court in Aztec, New Mexico, and learned that Peshlakai was not represented by counsel and that the file for his case had been destroyed.  See Addendum at 1.  It is therefore not known if Peshlakai waived his right to counsel in the Shoplifting case.  See id.

### B.     TRIBAL CASE.

Shiprock District Court is a tribal court with jurisdiction specified by Section 253 of Title 7 of Navajo Nation statutory law.   See Duncan v. Shiprock District Court, No. SC-CV-51-04, at 9 (Nav. Sup. Ct. 1986), available at http://www.navajocourts.org/suctopinions.htm (under 2004 Opinions).  The Navajo Nation district courts are vested jurisdiction over criminal, civil, and miscellaneous cases.  See id.  Miscellaneous matters are "all other matters provided by Navajo Nation statutory law, Diné bi beenahaz'áanii, and Navajo Nation Treaties with the United States of

America or other governments." Id. (internal quotations omitted).

## C.   DORMANT CHARGE.

An arrest warrant was issued in State of New Mexico v. Peshlakai, Cause No. M-147-CR-200500446 (San Juan County, New Mexico), on June 28, 2005.  The prosecutor, however, did not take any further action in that case.  See N.M.R.A, Rule 6-506(B) (stating that, if prosecution fails to bring the matter to trial within 182 days of certain triggering events, the complaint may be dismissed with prejudice).  Sometime later, the agent interviewed Peshlakai, and when asked, "So you raped her?" and Peshlakai responded, "Well yeah, I can put it that way." PSR, ¶ 42, at 14-15.  Peshlakai represents that he had thought the Navajo officer was investigating this federal case, for which he is being sentenced, but that the officer did not know of this case.  Peshlakai's confession follows the allegations of this case but not those of the dismissed state case.  See Sentencing Memo ¶ 17, at 6.  At the hearing on this matter, Peshlakai's counsel represented that the charges had been dismissed in State of New Mexico v. Peshlakai.  See Tr. at 56:23-67:4 (Spiers & Aarons).

## PROCEDURAL BACKGROUND

This matter did not go to trial, but the PSR recommends a number of enhancements that are fact-intensive.  Accordingly, the Court had an evidentiary hearing to take the testimony needed to make factual findings.  The Court stated it would study the transcript, review the case law, and make a ruling on the objections before it heard argument on and ruled on the request for a variance under United States v. Booker, 543 U.S. 220 (2005).

## A.   PESHLAKAI's PLEA.

Peshlakai pled guilty to aggravated sexual abuse in violation of 18 U.S.C. § 2241(a) and Crime in Indian Country in violation of 18 U.S.C. § 1153.  See Plea Agreement ¶ 3,  at 2, filed July 19, 2007 (Doc. 88).  In exchange, the United States agreed that Peshlakai had demonstrated an

acceptance of responsibility under U.S.S.G. § 3E1.1.  See Plea Agreement ¶ 7a, at 3.  These offenses

carry a base offense level of 30  See PSR ¶¶ 22, 23, at 7; U.S.S.G. § 2A3.1(a). In the Plea

Agreement, the parties agree that they disagree as to the application of U.S.S.G. §§ 2A3.1(b)(4)(B),

1B1.1, and 2A3.1(b)(5), and that those matters will be resolved by the Court using a preponderance

of evidence standard and by evidentiary hearing, if required.  See Plea Agreement ¶ 7(c), at 4. The

parties also acknowledge that the Court is not bound by their stipulations.  See id. ¶ 8, at 4.

### B.      PESHLAKAI'S VERSION OF EVENTS.

In paragraph 12 of the original PSR, the USPO inadvertently failed to refer the reader to

paragraph 21 for Peshlakai's version of this offense.  See Addendum to the PSR at 2, disclosed Oct.

16, 2007.  After the original disclosure of the PSR, however, Peshlakai submitted a written statement

of responsibility to the USPO.  See id.  As a result, Peshlakai's version of this offense can now be

found at paragraph 12 of the re-disclosed PSR, and his statement of acceptance of responsibility can

be found at paragraph 21. See PSR ¶ 21, at 7-8.

### C.      USE OF FORCE.

In the PSR, the USPO increased his offense level computations by 4 levels, because "the

offense involved conduct described in 18 U.S.C. § 2241(a)."  PSR ¶ 24, at 7 (citing U.S.S.G. §

2A3.1(b)(1)).  The USPO has amended paragraph 24 to include the details of how Peshlakai used

force against the victim.  See Addendum, at 3; PSR ¶ 24, at 9.  The Addendum provides that:

> According to the victim, during the commission of the instant offense, the defendant
> pushed her to the ground and told her to get on her hands and knees.  The defendant
> then reportedly hit the victim several times while she struggled with the defendant
> after he started taking off her pants.  Additionally, the defendant reportedly told the
> victim he would continue hitting her if she did not stop screaming.  At that point, the
> defendant reportedly continued taking off the victim's clothes.  When the victim
> stood up in an attempt to get away, the defendant reportedly pulled her pants and
> underwear down to her thighs and tore her shirt.  Although the victim managed to
> break free from the defendant, it was only for a brief time, because the defendant

-13-

caught up to the victim and reportedly hit her in the jaw with his fist.  The defendant then reportedly forced the victim to go back with him to the vehicle, where he completely removed the victim's pants and underwear.  When the victim managed to get back into her vehicle, the defendant reportedly grabbed the steering wheel and forced his way into the vehicle with the victim.  Reportedly, the defendant started hitting the victim again.  He then reportedly told the victim to drive up the nearby hill and park near a fenced gate.  After the victim did as she was instructed, the defendant told her to get into the backseat, where he sexually assaulted her with his penis and fingers.  It should be noted that according to the nurse practitioner who examined the victim, the contusions and abrasions on the victim's body were consistent with non-consensual sexual contact.

PSR ¶ 24, at 9.

### D.    SERIOUS BODILY INJURY.

The PSR adds two additional levels for "serious bodily injury," because the "offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241."  PSR ¶ 25, at 7. The USPO amended paragraph 25 to include details of the victim's serious bodily injury.  See id.

Those details are:

According to the victim, before the defendant sexually assaulted her, the defendant hit her about the face, head, and back with his fists several times.  As a result of being hit by the defendant, the victim had many bruises and abrasions on her body, and she also had a big bump on the back of her head.  The victim reported she also suffered from headaches for a while, and her body was very sore for approximately three weeks after being assaulted.  In addition to her physical injuries, the victim was not able to sleep, because she would hear voices for a time immediately following the incident.  Additionally, the victim explained that she pled for her life the night she was raped, because she thought she was going to die.  Consequently, the victim began going to counseling and was prescribed Prozac and Trazodone.  The victim advised that she stopped going to counseling for a while.  However, as the sentencing hearing nears, the victim feels she needs to resume counseling, because she cannot stop thinking about the incident, and she has been having trouble sleeping since she starting having nightmares about the incident.  It should be noted that the victim's husband at the time initially tried to be supportive of the victim, but he eventually decided he could not handle the fact that the victim was raped.  As result, the victim and her husband got a divorce, and now the victim lives alone, because their three teenage sons did not want to live with the victim.  The defendant further explained that she now lives in fear and solitude, and she sleeps with the lights and television on, because she is afraid that someone will break into her home.

-14-

PSR ¶ 25, at 10.

### E.    ENHANCEMENT FOR ABDUCTION.

The USPO assesses a 4-level increase against Peshlakai under U.S.S.G. § 2A3.1(b)(5), which

allows such an increase if the victim was abducted.  See PSR ¶ 26, at 10. Under U.S.S.G. §1B1.1,

app. n. 1(A), "'[a]bducted' means that a victim was forced to accompany an offender to a different

location."  PSR ¶ 26, at 10. The re-disclosed PSR sets forth the details of the alleged abduction.

See id.  Those details are:

> According to the victim, she hesitantly agreed to give the defendant a ride home,
> because the defendant claimed his vehicle had been stolen.  However, instead of
> giving the victim directions to his residence, the defendant reportedly directed the
> victim to a remote location out in the desert.  After the defendant reportedly began
> to assault the victim by hitting her several times and trying to rip off her clothes, the
> victim managed to briefly break free from the defendant.  The defendant then
> reportedly chased after the victim, and when he caught up to her, he reportedly hit
> her in the jaw with his fist.  At that point, the defendant reportedly forced the victim
> to go back with him to the vehicle, where he completely removed the victim's pants
> and underwear. When the victim managed to get back into her vehicle, the defendant
> reportedly grabbed the steering wheel and forced his way into the vehicle with the
> victim.  Reportedly, the defendant started hitting the victim again.  He then
> reportedly told the victim to drive up the nearby hill and park near a fenced gate.
> After the victim did as she was instructed, the defendant told her to get into the
> backseat, where he sexually assaulted her with his penis and fingers.

PSR ¶ 26, at 10-11.

### F.    CRIMINAL HISTORY POINTS.

In the original PSR, the USPO calculated a criminal history level of II after assessing two

points.  See PSR ¶ 37, at 10.  In both PSRs, the USPO assessed 1 criminal history point for a

misdemeanor shoplifting charge that was resolved in magistrate court.  In the original PSR,

Peshlakai was assessed another point for a conviction from the Shiprock District Court for the

unauthorized use of a vehicle.  See PSR, disclosed Sept. 10, 2007 ¶ 36, at 10 ("Attorney

representation is unknown.  This information was provided by the Shiprock District Court.").

On September 20, 2007, Peshlakai filed formal objections to the PSR.  See Sentencing Memo.  Peshlakai contested both points.  See id. ¶ 1, at 1.  In the Addendum to the PSR and the re-disclosed PSR, the USPO agrees with one of Peshlaki's objections, eliminates one of the criminal history points, and calculates a criminal history level of I.  See Addendum, at 2, PSR ¶ 37, at 13. Specifically, the USPO agrees that Peshlakai's conviction for Unauthorized Use of a Vehicle listed in paragraph 36 occurred in the Shiprock District Court, otherwise known as the Navajo Indian or Navajo Nation District Court, which is a tribal court.  See Addendum, at 2.  The USPO concedes that it inadvertently overlooked the fact that this is a tribal court and incorrectly assessed 1 criminal point to this conviction.  See id.  Consequently, the USPO corrected paragraph 36 to reflect that, pursuant to U.S.S.G. § 4A1.2(i), 0 criminal history points are assessed to this conviction.  See PSR ¶ 36, at 12.  The USPO furthermore corrected paragraph 37 to reflect that the total of the criminal history points is 1, which, pursuant to U.S.S.G. Chapter 5, Part A, establishes a criminal history category of I.  The USPO also amended paragraphs 59 and 60 based on the correct criminal history category. See PSR ¶ 37, at 13.

### G.    SIMILAR CHARGE.

Although the PSR does not assess any points against Peshlakai for a dormant charge, the PSR refers to a "pending" charge involving a similar offense.  PSR ¶ 42, at 14; State of New Mexico v. Peshlakai, Cause No. FR2005-446 (San Juan County, New Mexico).  Paragraph 42 of the PSR discusses a case in San Juan County Magistrate Court, Case number FR2005-446. See PSR ¶ 42, at 14.  That case charged Peshlakai with kidnapping, criminal sexual penetration, criminal sexual contact -- felonies, and aggravated battery -- a misdemeanor.  See id.  The UPSO provided the following details:

On June 14, 2005, a detective for the New Mexico State Police was dispatched to the

San Juan Regional Hospital Emergency Room in Farmington, New Mexico, in reference to a possible rape. Upon arrival, the agent made contact with the alleged victim[3] . . . , and conducted an interview with her. According to [the victim], she and her friends were standing outside a bar in Farmington, when a man, later identified as the defendant, exited the bar. [The victim]'s friends gave money to the defendant to buy beer for them, and then the defendant asked [the victim] to go with him. The two got into the defendant's vehicle, but the defendant did not stop to buy the beer. Instead, the defendant drove onto Navajo Route 36 and parked his vehicle just off of the dirt road. As [the victim] started to get out of the vehicle, the defendant reportedly put his hand down the top of her dress and touched her breasts, ripping off some of the buttons on her dress in the process. After [the victim] attempted to run away and scream for help, the defendant caught up to her and drug her by the hair back to his vehicle. He then reportedly forced her into the back of his vehicle, where he ripped off her panties and the rest of the buttons on her dress. At that point, the defendant allegedly penetrated [the victim]'s vagina with his penis. When the defendant was done after approximately 15 minutes, [the victim] asked him if she could retrieve her sandal, as it had fallen off when he drug her back to the vehicle. The defendant allowed her to do so. While [the victim] was putting her clothes back on, the defendant fled the area on foot. At that time, [the victim] crawled over to a large chainlink fence and found someone to call the police. It should be noted that while the detective was interviewing [the victim], he noticed she only had one sandal with her. When he asked about her other sandal, [the victim] informed the agent that her other sandal was in the defendant's vehicle. The detective also noticed that [the victim] had a bump on the left side of her forehead, scrapes and scratches on her left arm, a large bump and scrape on her left buttocks, and large bumps and scrapes on her left leg. All of these injuries appeared to be consistent with having been drug along the ground. Shortly thereafter, the defendant's vehicle was impounded, and the officer who secured the vehicle observed a pair of pink panties and one sandal matching [the victim]'s other sandal in the vehicle. Sometime later, the agent interviewed the defendant, and asked, "So you raped her?" the defendant stated, "Well yeah, I can put it that way." Based on this information, a warrant was issued for defendant's arrest on June 28, 2005. It appears the warrant was served while the defendant was in federal custody for the instant offense, and the New Mexico State Police in Farmington, New Mexico, placed a detainer on the defendant at that time.

PSR ¶ 42, at 14-15.

Several delays in this federal case were occasioned by Peshlakai waiting to see what, if anything, might happen in that state case. See, e.g., Unopposed Motion to Vacate February 2006

---

[3]This alleged victim is a different person from Sandra T.

Trial ¶ 2, at 1, filed Feb. 7, 2006 (Doc. 25); Unopposed Motion to Vacate March 2006 Trial ¶ 2, at

1 (Doc. 28)("Recently the prosecution disclosed an ongoing investigation involving another female

victim.  In the defendant's police statement to the investigator, it appears that he is reciting his

version of the facts in this case [and] appears unaware of an unrelated investigation."); Unopposed

Motion to Vacate April 2006 Trial, filed Mar. 31, 2006 (Doc. 31); Unopposed Motion to Vacate

June 2006 Trial, filed June 6, 2006 (Doc. 41); Unopposed Motion to Vacate July 2006 Trial, filed

July 17, 2006 (Doc. 45).  Peshlakai represents that, in June 2007, the Assistant United States

Attorney of record, on his information and belief, informed Peshlakai's counsel that the state

prosecutor did not intend to prosecute the dormant state charge.  See Sentencing Memo ¶ 16, at 6.

Peshlakai also reports that, on June 22, 2007, the state public defender of record, Christian Hatfield,

of Gallup, New Mexico, confirmed this implicit nolle prosequi via electronic mail.  See id.

      In accordance with 18 U.S.C. § 3661, the USPO included paragraph 42, which references

San Juan County Magistrate Court Case No. FR2005-445, because at the time of the original

disclosure of the PSR, this case was still pending against Peshlakai.  See Original PSR ¶ 42, at 11.

Since the original disclosure of the PSR, however, the USPO has learned that this case was

dismissed on September 20, 2007.  See Addendum, at 2.  The Prosecutor filed a nolle prosequi

because of this federal case.  See Re-Disclosed PSR ¶ 42, at 14.  Consequently, this case is no longer

pending.  See id.  The USPO therefore amended paragraph 42 to show that this similar case is now

a part of the "Other Arrests" section of the PSR and to reflect that the case has been dismissed. Id.;

PSR ¶ 42, at 14-15.  In the Addendum, the USPO noted that, "[p]ursuant to 18 U.S.C. § 3661, no

limitation shall be placed on the information concerning the defendant's background, character, and

conduct, which the Court may receive and consider for the purposes of imposing an appropriate

sentence."  Addendum, at 2.  The USPO stated that it included  paragraph 42 in its PSR, as other

information under 18 U.S.C. § 3661.  See id.

The USPO denies that it included this information in the PSR to prejudice the Court. See Addendum, at 2.

### H.     THE OCTOBER 16, 2007 SENTENCING HEARING.

At the October 16, 2007  sentencing hearing, the United States called the victim, Sandra T., to support its position that the USPO had correctly enhanced Peshlakai's offense level for infliction of serious bodily injury and for abduction.  See Tr. 14:13 (Spiers).  In response, Peshlakai took the stand, primarily to rebut the allegation of abduction.  See Tr. at 39:11-12 (Aarons).  After hearing the testimony and oral argument on all objections, the Court continued the hearing to review the transcript and study the law to determine accurately the advisory guideline sentence.  The Court stated that, after it decided the objections, it would reset the sentencing hearing to hear arguments on Peshlakai's request for a variance under United States v. Booker.  Thus, this opinion and order addresses only the objections in Peshlakai's Sentencing Memorandum.

At the hearing, the attorneys for the parties made some important concessions.  Peshlakai's counsel, Mr. Steve Aarons, acknowledged that he was shifting his argument away from a legal argument on U.S.S.G. § 2A3.1(b)(1) and making it a Booker argument instead.  See Tr. at 7:15-8:1 (Aarons & Court).  Mr. Aarons also conceded that there was force.

> Q.     [B]ut you're conceding there was force here?
>
> A.     Right.  There is the absence of consent by the defendant taking sex and being physical with her, and that's -- that's why he has always for that -- to the extent wanted to plead guilty.  Yes, we concede that there was -- that he did have his way and took advantage of her and hit her  . . . .

Tr. at 72:1-11 (Court & Aarons).

Mr. Aarons further agreed that, under some circumstances, there can be "psychomatic or

emotional injuries" that would satisfy the serious bodily injury enhancement requirements. Tr. at 68:4-13 (Court & Aarons).  Mr. Aarons argued, however, that such injuries would have to be "beyond the pale" and something more serious than an "average sexual assault."  Tr. at 68:13-19 (Aarons).  Later, Mr. Aarons stated: "I think there could be a case where the psychological trauma is so persuasive that the Court would overlook or look beyond the absence of bodily injury and look to -- because the mind is part of the body and emotions are part of the holistic person." Tr. at 85:1-5 (Aarons).

Mr. Aarons admitted that his understanding of the victim's testimony was that, before Peshlakai raped her, they were driving back towards the main road and Peshlakai told her to park where he then raped her in the backseat.  See Tr. at 86:24-87:3 (Aarons).  The United States somewhat abandoned the position taken by the USPO in paragraph 26 of the re-disclosed PSR, did not believe that Sandra T. was abducted at the bar, did not argue that she was forced to drive to the desolate area where she was first sexually abused.  See Tr. at 89:24-90:2 (Spiers).  Rather, the United States took the position that she was not abducted until Peshlakai forced her to drive to the hill, where he sexually abused her a second time. Mr. Paul Spiers, for the United States, argued that the abduction occurred when Peshlakai told the victim to drive up the nearby hill and park near a fenced gate.  See Tr. at 91:5-12 (Court & Spiers).

> When he tells her, after he's beaten her, stripped her of her clothes, and he tells her to drive up to the top of the hill and park the car, that is the abduction.  Prior to that he has been tackling her and doing all the other things that we've heard about, beating her, stripping of her of her clothing.  Then he orders her at that point to drive the car up to the top of the hill and park the car and then he pulls her into the backseat and rapes her, we are submitting that at that point, going from point A, at the bottom of the hill to the top of the hill and parking her car under his command is the abduction.

> * * * *

-20-

> Driving all the driving between the Anasazi bar and to the point where she thinks he's getting out to relieve himself, that part is her as she said being a nice person, thinking that she was helping somebody out, giving him a ride home.

Tr. at 89:24-90:25 (Spiers).  The United States argued that if a but for test were applied to the facts and circumstances of this case, then "but for the force that [Peshlakai] had used against [Sandra T.] and but for the command that he made upon her she never would have driven from point A to point B.  She would have driven home."  Tr. at 90:15-20 (Spiers).

| | |
|---|---|
| THE COURT: | So if you have -- if you have the PSR, the Addendum in front of you, the response number 7 where she manages to break free from the defendant and then he forced to get back with him in the vehicle, at those two points no abduction has occurred, if I understand what you're saying, the abduction occurred when he told her to drive up the nearby hill and park near a fenced gate. |
| MR. SPIERS: | Yes. |
| THE COURT: | So up to that point, there's not -- there's not been an abduction; that's when the abduction occurs. |
| MR. SPIERS: | Yes, sir. |
| THE COURT: | And that is the abduction, nothing that occurred before or after that's relevant, that's the relevant abduction here? |
| MR. SPIERS: | Yes, sir. |

Tr. at 91:1-16 (Court & Spiers).

Mr. Aarons admitted that Peshlakai's argument regarding paragraph 34 of the PSR-- which involved the USPO's mistake in paragraph 34 in Peshlakai  him one criminal history point for a misdemeanor shoplifting charge-- was moot.  See Tr. at 95:23-96:1 (Court & Aarons).

## RELEVANT NEW MEXICO CRIMINAL LAW

When Peshlakai filed his Sentencing Memorandum, it must have appeared to him that certain aspects of his criminal history would invoke some examination of certain aspects of state law.  The

procedural history of the state cases, however, appears to make much, if not at all, of that analysis of state law unnecessary.   Nevertheless, so that the objections and the Court's ruling on them are clear, the Court will briefly set forth the relevant state law.

### A.   CONDITIONAL DISCHARGE.

Unlike conditional discharges for other crimes, the New Mexico Legislature crafted a special procedure to defer prosecution for first offenders involving possession of a controlled substance. Compare N.M.S.A. 1978 § 30-31-28C (first offenses involving possession of controlled substances) ("[D]ischarge and dismissal under this section shall be without court adjudication of guilt.")(emphasis added), with N.M.S.A. 1978 § 31-20-13 (setting forth general rule for conditional discharge of other New Mexico crimes)(stating that "the court may, without entering an adjudication of guilt, enter a conditional discharge order and place the person on probation on terms and conditions authorized by Sections 31-20-5 and 31-20-6 NMSA 1978. A conditional discharge order may only be made available once with respect to any person.")(emphasis added). Peshlakai sets forth the above law to argue that paragraph 34 of the original PSR was mistaken in penalizing him one criminal history point for a misdemeanor shoplifting charge.  See Sentencing Memo. ¶¶ 2-5, at 1-2. Peshlakai argues that "a review of that case indicates someone else, not [Peshlakai] received a drug conditional discharge for possession of less than one ounce of marijuana."  Sentencing Memo. ¶ 3, at 1.  Peshlakai also argues that a diversion from judicial process, such a deferred prosecution, is not counted.  See Sentencing Memo. ¶ 5, at 2 (citing U.S.S.G. § 4A1.2(f) and United States v. Miller, 56 F.3d 719, 722 (6th Cir. 1995)).

### B.   UNLAWFUL TAKING OF A MOTOR VEHICLE.

Under the laws of New Mexico, the unlawful taking of a motor vehicle constitutes a felony offense.  See N.M.S.A. 1978 § 66-3-504(A).  Peshlakai argues that there is a constitutional

prohibition against counting prior uncounseled misdemeanor convictions.  See Sentencing Memo. ¶ 9, at 4.  He argues that the use of his prior conviction discussed in the original PSR at paragraph 36 "causes additional concern because under the laws of New Mexico the unlawful taking of a motor vehicle constitutes a felony offense."  Id.  He argues that his conviction for unlawful taking of a vehicle, which was a tribal court case, cannot be used to support guilt or enhance punishment for this offense.  See id. (citing Gideon v. Wainwright, 372 U.S. 335 (1963)).

**RELEVANT LAW REGARDING SENTENCING GUIDELINES**

Peshlakai's objections implicate a number of the sentencing guidelines.  As the United States Court of Appeals for the Tenth Circuit has emphasized, it is important for the district court to determine first the correct advisory guideline sentence before it determines whether to deviate from that guideline sentence.  While some of Peshlakai's arguments in support of his objections overlap with his arguments for a variance under United States v. Booker, the Court will address here only his objections and consider his arguments for a variance at the continuance of the sentencing hearing.

**A.      18 U.S.C. § 3661.**

Pursuant to 18 U.S.C. § 3661, "[n]o limitation shall be placed on the information concerning the defendant's background, character, and conduct that the court may receive and consider for the purposes of imposing an appropriate sentence."  See United States v. Soehnge, 210 Fed.Appx. 816, 818 n. 1 (10th Cir. 2007) (noting that the district court was within its bounds to take evidence not included in the plea agreement or the indictment to determine relevant conduct for sentencing); United States v. Jardine, 184 Fed.Appx. 728, 730 (10th Cir. 2006)(noting that 18 U.S.C. § 3661 remains "in full effect even after Booker.")(citing United States  v. Magallanez, 408 F.3d 672, 684 (10th Cir. 2005); United States  v. Magallanez, 408 F.3d 672, 684 (10th Cir. 2005)(noting that the

Guidelines and Booker did not alter the sentencing court's discretion under 18 U.S.C. § 3661)(citing United States v. Watts, 519 U.S. 148, 152 (1997)) ;United States v. Bennett, 147 Fed.Appx. 761, 763 (10th Cir. 2005)(noting the "broad power of sentencing courts to consider information beyond the indictment.");  United States v. Hanrahan, No. CR 04-1978 JB, 2006 WL 4061161 (D.N.M. Sept. 3, 2006)(Browning, J.).

      **B.**     **THE LEGAL STANDARD FOR ENHANCEMENTS.**

      On disputed facts, the United States bears the burden of proving by a preponderance of evidence the propriety of a sentence enhancement.  See United States v. Guzman, 318 F.3d 1191, 1198 (10th Cir. 2003).  The district court cannot shift the burden of proof to the defendant on an enhancement.  See id. (noting that the district court improperly shifted the burden to the defendant because it found an enhancement was properly imposed, "because the court relied solely on hearsay statements and representations about police reports described second-hand in the [PSR]" and the "the government did not present any live witness or documentary evidence.").  Because the district court's interpretation of the sentencing guidelines presents a legal question, on appeal, the Court of Appeals will review the interpretation de novo.  See United States v. Plotts, 347 F.3d 873, 875 (10th Cir. 2003).

      Peshlakai suggests that contrary precedent notwithstanding, constitutional due process requires a jury to find abduction beyond a reasonable doubt.  See Sentencing Memo. at 12 n.2 (stating that, "[c]ontrary precedent notwithstanding, constitutional due process still requires a jury to find abduction beyond a reasonable doubt.").  Peshlakai supports his argument by citing to United States v. Lynch, 397 F.3d 1270 (10th Cir. 2005), and United States v. Conlan, No. 06-1510, 2007 WL 2538047 (10th Cir. Sept. 6, 2007) (Seymour, J.).  At the hearing on this matter, however, Peshlakai's counsel conceded that he believed the Court needed to find sufficient evidence for an enhancement

by preponderance of the evidence.  See Tr. at 65:8-9, 69:20 (Aarons).

In any case, the Tenth Circuit's opinions in United States v. Lynch[4] and United States v.
Conlan do not support a greater burden of proof than preponderance of the evidence.  In United
States v. Conlan, 2007 WL 2538047, at *1, the United States had objected to a variance that the
USPO recommended for the court to impose a sentence below the advisory guideline range.  See
id.  It "repeatedly argued to the district court that [the defendant] had the burden of overcoming a
presumption that the advisory guideline range was reasonable."  Id.  The Tenth Circuit held that the
district court erred in imposing "the appellate presumption of reasonableness to the advisory

---

[4]In United States v. Lynch, 397 F.3d at 1272, the district court found that "every factor
influencing a defendant's sentence be proven beyond a reasonable doubt or admitted by the
defendant."  Id.  The Government argued that the district court mistakenly applied Blakely v.
Washington, 542 U.S. 296 (2004), to the Guidelines.  See  United States v. Lynch, 397 F.3d at 1272.
The Government contended that Blakely v. Washington was inapplicable to the Guidelines.  See
United States v. Lynch, 397 F.3d at 1272.  The Tenth Circuit explained that:

In Booker's companion case, the district court held that Blakely applied and
sentenced the defendant (Ducan Fanfan) to 78 months (given a guideline range of
63-78 months) relying solely on drug quantity found by the trial jury. Had the trial
judge relied upon facts found by him by a preponderance of the evidence
(concerning role in the offense and drug quantity), the guideline range would have
been 188-235 months. The government appealed. Although Mr. Fanfan's sentence
involved no Sixth Amendment violation, the [Supreme] Court was clear about the
remedy: "Nonetheless, the Government (and the defendant should he so choose) may
seek resentencing under the system set forth in today's opinions. Hence we vacate
the judgment of the District Court and remand the case for further proceedings
consistent with this opinion." In imposing this remedy, the Court specifically
rejected defense suggestions that the Sixth Amendment holding be engrafted on the
Sentencing Guidelines, or that provisions of the Sentencing Guidelines allowing
judicial factfinding be excised.

Accordingly, this case must be remanded to allow the government (and Mr. Lynch
should he so choose) to seek resentencing in accordance with the standards
announced by the Court in Booker.

United States v. Lynch, 397 F.3d at 1272.

guidelines when sentencing" rather than "impose a sentence sufficient, but not greater than necessary to comply with the purposes of section 3553(a)(2)." Id.

The Tenth Circuit remanded because the district could failed to sentence in accordance with the United States v. Booker standards. See id. See also United States v. Zuni, No. CR 05-2369 JB, 2007 WL 1302615, at * 20 (D.N.M. Mar. 5, 2007)(sustaining the defendant's objection to an assertion that the defendant kidnaped and sexually assaulted his ex-girlfriend because it did not "find by a preponderance of the evidence -- based on the evidence that it heard at trial, given under oath, and subject to cross-examination -- that a sexual assault took place.").

## C.     DOUBLE COUNTING.

Impermissible double counting "occurs when the same conduct on the part of the defendant is used to support separate increases under separate enhancement provisions which necessarily overlap, are indistinct, and serve identical purposes." United States v. Blake, 59 F.3d 138, 140 (10th Cir. 1995). See id. at 139-40 (stating that it is impermissible for a sentencing court to "enhance a defendant's sentence for robbery under the Guidelines by reason of his use of a firearm if the defendant has been separately convicted and is being sentenced  . . . for using the firearm in the commission of the same robbery."); United States v. Pearson, 211 F.3d 524, 526 (10th Cir. 2000)("[S]omething more must be done.").  "The bar on double counting comes into play only if the offense itself necessarily includes the same conduct as the enhancement." United States v. Senn, 129 F.3d 886, 897 (7th Cir. 1997)(emphasis in the original)(explaining that enhancement of the defendant's sentence based upon U.S.S.G. § 2D1.1(b)(2)(B), which enhances a defendant's drug trafficking sentence for acting as the captain/navigator of a smuggling ship was proper because in the defendant's "case, the offense of importation covers a multitude of methods used by smugglers to bring drugs to the United States -- it does not necessarily include the conduct of captaining a

boat."). See United States v. Ford, 21 F.3d 759, 765 (7th Cir. 1994)("[T]he base offense level prescribed by the guidelines for a particular crime presumably reflects, or 'includes,' those characteristics considered by Congress to inhere in the crime at issue.")(quoting United States v. Butt, 955 F.2d 77, 89 (1st Cir. 1992)); United States v. Reese, 2 F.3d 870, 895 (9th Cir. 1993)("[T]he use of a single aspect of conduct both to determine the applicable offense guideline and to increase the base offense level mandated thereby will constitute impermissible double counting only where, absent such conduct, it is impossible to come within that guideline."). Double counting does not occur even "[t]he same acts may be enhancing conduct, e.g., recklessly creating a substantial risk of death or serious bodily injury to another under § 2L1.1(b)(5), even though they also contributed to the outcome of death or serious bodily injury under § 2L1.1(b)(6)." United States v. Cardena-Garcia, 362 F.3d 663, 667 (10th Cir. 2004). "Specifically, § 2L1.1(b)(5) allows for an enhancement based upon the defendant's intentional or reckless **conduct**, with no consideration of the outcome; whereas § 2L1.1(b)(6) provides for an enhancement based upon the **outcome** . . . with no consideration of the defendant's intentional or reckless conduct." United States v. Cardena-Garcia, 327 F.3d at 667 (emphasis in the original).

"The Sentencing Commission plainly understands the concept of double counting and expressly forbids it where it is not intended." United States v. Archdale, 229 F.3d 861, 869 (9th Cir. 2000)(citations omitted). In United States v. Wimberly, 60 F.3d 281 (7th Cir. 1995), the United States Court of Appeals for the Seventh Circuit held that the "Guidelines provide . . . enhancements as punishment mechanisms distinct from the underlying offense." 60 F.3d at 288. See id. (explaining that while the defendant was convicted of engaging in a sexual act with a person under 12 years of age, the trial court appropriately applied a 4-level increase due to the victim's age under U.S.S.G. § 2A3.1(b)(2) because that guideline applies to both 18 U.S.C. § 2241 and § 2242 and a

violation of § 2242 does not require that the victim be less than 12 years old and a conviction under either statute results in the same base offense level of 27 months and therefore the enhancement for victims under 12 years of age, § 2A3.1(b)(2), does not constitute double counting because it is a punishment mechanism distinct from the underlying offense).

In United States v. Rice, 358 F.3d 1268 (10th Cir. 2004), cert. denied, judgment vacated, 543 U.S. 1103 (2005), opinion reinstated, 405 F.3d 1108 (10th Cir. 2005), the Tenth Circuit held that the district court impermissibly double counted the defendant's conduct in violation of the Sentencing Guidelines. See id. at 1276. The defendant pled guilty to transportation of a videotape containing child pornography. See id. The video he transported was one that he produced himself with a young girl in Mississippi. See id. The guideline applicable to his pleaded offense was U.S.S.G. § 2G2.2, which would provide a base offense level of 17. See id. That guideline included a cross-reference to U.S.S.G. § 2G2.2(c), which provides that, if the offense involves causing a minor to engage in sexually explicit conduct for the purpose of producing a visual depiction of such conduct, then a different guideline would be applicable, providing a base offense level of 27. See id. The trial court then also used the conduct underlying the defendant's production of that videotape to increase his criminal history category pursuant to § 4A1.3. See id. The defendant argued that "double use amounts to impermissible double counting." Id. The Tenth Circuit agreed with the defendant "that the double use of the Mississippi conduct violated the Sentencing Guidelines." Id.

### D.    U.S.S.G. § 2A3.1(b)(1).

U.S.S.G. § 2A3.1 deals with "Criminal Sexual Abuse; Attempt to Commit Criminal Sexual Abuse." The statutory provisions involved are 18 U.S.C. §§ 2241, 2242. Section 2241, which involves the crime of aggravated sexual abuse, requires the defendant to have knowingly caused another to engage in a sexual act: (i) by using force against that other person; or (ii) by threatening

or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping.  Section 2242, in contrast, defines sexual abuse as causing another person to engage in a sexual act by threatening or placing that other person in fear "other than by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping."

U.S.S.G. § 2A3.1(b)(1) provides: "If the offense involved conduct described in 18 U.S.C. § 2241(a)or (b), increase by 4 levels."  This provision ends discussion whether rape always or only sometimes involves the use of force.  Moreover, it should be noted that the U.S.S.G. does not require enhancement for crimes under 18 U.S.C. § 2242.

According to the Federal Sentencing Guidelines Handbook, "Section 2A3.1(b)(1) applies where the use of force is sufficient to compel the victim's submission to the sexual assault."  Moreover, "the enhancement does not require a showing that greater force was used than would be required to sustain a conviction under 18 U.S.C. § 2241(a)-(b)."  R. Haines Jr., F. Bowman, III, & J. Woll, Federal Sentencing Guidelines Handbook at 239 ("Handbook").  To support the application of a 4-level increase for the use of force, pursuant to subsection (b)(1), the Handbook refers to United States v. Running Horse, 175 F.3d 365, (8th Cir. 1999), in which the United States Court of Appeals for the Eighth Circuit held that "force sufficient to obtain a conviction under 18 U.S.C. § 2241(a) will also sustain an enhancement under § 2A3.1(b)(1)."  Id. at 239 n.17.

In United States v. Talk, 13 F.3d 369, 370-71 (10th Cir. 1993), the defendant was convicted of committing rape on Indian land in the United States District Court for the District of New Mexico.  The district court did not apply a 4-level upward adjustment for use of force in connection with the rape, because "the actions of the defendant were not at a level or degree that would justify a four-level adjustment pursuant to 2A3.1(b)(1)."  Id. at 372.  The district court interpreted U.S.S.G.

-29-

2A3.1(b)(1) to mean that, even though a defendant is convicted under 18 U.S.C. § 2241, "an upward adjustment is warranted only if there existed some degree of force that exceeded the 'average' force necessary to rape someone."  Id.

While the Tenth Circuit in United States v. Talk stated that it "emphathize[d] with the district court's efforts to fashion a just sentence, the Court of Appeals stated that the official commentary to the Guidelines is clear: 'The base offense level represents sexual abuse as set forth in 18 U.S.C. § 2242.  An enhancement is provided for use of force; threat of death, serious bodily injury, or kidnapping; or certain other means as defined in 18 U.S.C. § 2241.'" 13 F.3d at 372 (quoting U.S.S.G. § 2A3.1, cmt. (backg'd)).  The Tenth Circuit, through the Honorable Paul Kelly, Jr., United States Circuit Judge, was clear in its interpretation of this commentary: "We read this commentary to mean that a four-level upward adjustment is mandatory for all defendants convicted under 18 U.S.C. § 2241."  Id. (citing United States v. Bordeaux, 997 F.2d 419, 420 (8th Cir. 1993)).  The Tenth Circuit then found that the district court had erred in failing to apply such a mandatory upward adjustment, and remanded the case with instructions to vacate the sentence and resentence in accordance with the appellate opinion.  See id.

In United States v. Pena, 216 F.3d 1204  (10th Cir. 2000), the defendant pled guilty to two counts of aggravated sexual abuse, and the Honorable LeRoy C. Hansen, Jr., United States District Judge, gave the defendant a sentence that included enhancements under the Sentencing Guidelines based on use of force.  See 216 F.3d at 1207.  The Tenth Circuit affirmed.  See id. at 1212.  Judge Kelly, in an opinion for the appellate panel, held that application of enhancements for use of force did not constitute impermissible "double counting," because enhancements serve distinct purposes and are aimed at different harms.  Id. at 1209-10.  Judge Kelly stated that the essence of the defendant's "double counting" argument in that case was that a sentencing enhancement for the use

of force is implicit in the U.S.S.G. § 2A3.1(b)(2)(A) enhancement for a victim under twelve years of age.  See 216 F.3d at 1209.  The defendant asserted that, because children under the age of twelve are legally incapable of consent to sexual acts, there is a presumption that force was applied.  See id.  The United States responded "that the enhancement provisions of §§ 2A3.1(b)(2)(A) and 2A3.1(b)(1) address different conduct, do not overlap and serve different purposes."  Id.

The Tenth Circuit in United States v. Pena agreed with the United States' argument.  The Court stated that a court may apply separate enhancements to reach distinct aspects of the same conduct.  See 216 F.3d at 1209.  As to § 2A3.1(b)(1), Judge Kelly stated: "Enhancement pursuant to § 2A3.1(b)(1) punishes the actual use of force used to overbear the will of another in perpetrating aggravated sexual abuse."  216 F.3d at 1210. Judge Kelly summarized: "Child sexual abuse can take place even in the face of factual consent by the victim. The same cannot be said of adult rape."  216 F.3d at 1210-11.

The defendant in United States v. Pena also argued that, because a force enhancement is mandatory in the context of adult rape, citing United States v. Talk, 13 F.3d 369, 371-372 (10th Cir. 1993), but not in the context of aggravated sexual abuse of a child, it is clear that the latter offense has an implicit enhancement for the use of force.  See 216 F.3d at 1210-1211.  Judge Kelly stated that this argument is without merit.  See id. at 1211. "Thus, in a case involving the sexual abuse of a child, the guidelines provide the sentencing judge with the flexibility to apply a force enhancement depending on the facts. The force enhancement is not mandatory -- not because it is already contemplated by enhancements for the youth of the victim -- but rather because unlike adult rape, it may not always be appropriate given the factual predicates of the crime."  216 F.3d at 1210-11.

### E.    SERIOUS BODILY INJURY.

U.S.S.G. § 2A3.1, the guideline for "Criminal Sexual Abuse" also allows an enhancement

for "serious bodily injury." U.S.S.G. § 2A3.1(b)(1) and  U.S.S.G. § 2A3.1(b) states: "(1) If the offense involved conduct described in 18 U.S.C. § 2241(a) or (b), increase by 4 levels. . . .(4)(A) If the victim sustained permanent or life-threatening bodily injury, increase by 4 levels; (B) if the victim sustained serious bodily injury, increase by 2 levels; or (C) if the degree of injury is between that specified in subdivisions (A) and (B), increase by 3 levels."   U.S.S.G. § 2A3.1, Application Note 1, Definitions, states that, for purposes of this guideline, "'serious bodily injury' [has] the same meaning given those terms in Application Note 1 of the Commentary to § 1B1.1 (Application Instructions).  U.S.S.G. §1B1.1, cmt. app. n.(1)(L) provides:

> Serious bodily injury means injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation. In addition, 'serious bodily injury' is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. 2241 or 2242 or any similar offense under state law.

Id.  Before 1997, the commentary to U.S.S.G. § 2A3.1, cmt., app. n.1 stated that: "permanent or life-threatening bodily injury", and "serious bodily injury" have the meaning given those terms in Application Note 1 of the Commentary to § 1B1.1 (Application Instructions)." In 1997, the Committee added a sentence.  U.S.S.G. § 2A3.1, cmt., app. n.1 now states that, for the purposes of the crime of aggravated sexual abuse, "'serious bodily injury' <u>means</u> <u>conduct</u> <u>other</u> <u>than</u> <u>criminal</u> <u>sexual</u> <u>abuse</u>, which already is taken into account in the base offense level under subsection (a)." U.S.S.G. § 2A3.1, app. n. 1(emphasis added).

In an unrelated case, the Court refused to apply the "serious bodily injury" enhancement solely because of the sexual nature of the predicate offense: "In sexual assault cases, 'serious bodily injury' refers to 'conduct other than criminal sexual abuse, which already is taken into account in the base offense level.' U.S.S.G. § 2A3.1 cmt. n.1." <u>United States v. Donovan Jones Neha</u>, No. 04-

1677, Memorandum Opinion and Order, at 3, filed Feb. 18, 2007 (Doc. 350)(D.N.M. 2007)(Browning, J.)(citing United States v. Guy, 282 F.3d 991, 996 (8th Cir. 2002)(finding serious bodily injury enhancement provision is inapplicable to defendants convicted for criminal sexual abuse)). In United States v. Donovan Jones Neha, No. 04-1677, the United States contended that a 2-level increase was warranted "because the victim complained of pain in her anal and vaginal areas, and continues to experience vaginal discharge." Id. at 2. The United States, however, did not prove "by a preponderance of the evidence that the actions constituting the criminal sexual abuse are distinct from those that caused any serious bodily injury." Id. at 3.

In United States v. Guy, the Eighth Circuit found a district court had erred in using U.S.S.G. § 1B1., cmt. n.1(j), to enhance a defendant's sentence for aggravated sexual abuse in violation of 18 U.S.C. §§ 2241(c) and 1153 . See 282 F.3d at 992, 996. The victim in that case was raped, which resulted in a pregnancy. See id. at 992. The Eighth Circuit noted that, in 1997, the Sentencing Commission amended U.S.S.G. § 1B1.1, cmt. n.1(j), "making it clear that the definition of serious bodily injury can now include a non immediate bodily or mental impairment resulting from a rape." Id. at 994. It also noted that, before the 1997 amendment, courts had applied that guideline "in rape cases where the victim suffered mental impairment and psychological trauma." Id. at 994 n.1 (citing United States v. Scott, 985 F.2d 576 (Table), 1993 WL 12495, at *5-6 (9th Cir. Jan. 22, 1993); United States v. Wallace, 976 F.2d 734 (Table), 1992 WL 233908, at *4-5 (6th Cir. June 19, 1992).[5]

_____

[5]The Tenth Circuit has not directly addressed whether psychological impairment alone is sufficient to warrant an enhancement for serious bodily injury. Cf. United States v. Lanzi, 933 F.2d 824, 827 (10th Cir. 1991)(stating that, "[w]ithout determining whether purely psychological injury can ever be 'bodily injury' within the meaning of the guidelines," psychological injury suffered by bank teller in robbery evidenced by attending a single counseling session and changed occupation was insufficient to be serious bodily injury within the meaning of U.S.S.G. § 1B1., cmt. n.1(b)). In United States v. Lanzi, "the government presented evidence that the teller has seen a counselor and quit her job out of fear for her life." 933 F.2d at 827. The district court concluded that there was

The Eighth Circuit interpreted the 1997 amendment to the Guidelines as a response to United States v. Rivera, 83 F.3d 542, 547-48 (1st Cir. 1996).  See United States v. Guy, 282 F.3d at 995.  The Eighth Circuit noted that, in  United States v. Rivera, a carjacker's rape of his victim did not inflict serious bodily injury.  See United States v. Guy, 282 F.3d at 995.  The Eighth Circuit noted that, under the 1997 amendments, someone in that carjacker's situation would possibly "receive an enhancement for serious bodily injury," because "[h]is conduct constituted aggravated sexual abuse, in violation of 18 U.S.C. § 2241, in addition to supporting his conviction for carjacking."  Id.

The Eighth Circuit, in United States v. Guy, also explained however: "The district court relied on three parts of Application Note 1(j) in applying the enhancement to [the defendant] under § 2A3.1(b)(4)(B): the deeming provision . . . ."  Id. at 992.  "The deeming provision, in combination with the restriction in § 2A3.1, appears to have been intended to make an enhancement for serious bodily injury automatically available if the offender's conduct underlying his conviction for another type of offense also involved criminal sexual abuse, but not if the conviction is for sexual abuse."  Id. at 996.  The Eighth Circuit argued that "the Commission provided that the same conduct would not automatically determine both the base offense level for a criminal sexual abuse offense and an enhancement for serious bodily injury, a specific offense characteristic."  Id.  It found the district court erred in enhancing the defendant's sentence for serious bodily injury under U.S.S.G. §1B1.1, cmt. n. 1(l) that "deems" serious bodily injury occurs if the offense involves criminal sexual abuse.

The Eighth Circuit in United States v. Guy noted that "[t]he district court also rested its enhancement on protracted impairment."  Id. at 996. "The district court also cited [the victim]'s pain

_____

psychological injury, but not bodily injury required for a 2-level base offense level increase under U.S.S.G. § 2B31(b)(3). See id.  The Tenth Circuit affirmed the district court's determination that a 2-level base offense increase was not warranted.  See id.

-34-

and suffering as a basis for the enhancement under § 2A3.1(b)(4)(B)." Id. at 997.   The Eighth

Circuit remanded the case because the district court did not make specific findings regarding those

conclusions of law.  See id. at 996-97 ("Although the district court relied on protracted impairment

to find serious bodily injury in this case, it did not make underlying findings as to what specific

bodily or psychological impairment [the victim] suffered. We therefore remand for specific findings.

. . . Without more specific findings by the court, however, we cannot tell what it had in mind or

whether an enhancement for extreme physical pain would be appropriate.").

On remand, the district court in United States v. Guy, 252 F.Supp. 2d 879 (D.N.D. 2003),

aff'd in United States v. Guy, 340 F.3d 655 (8th Cir. 2003), found enhancement was required for

serious bodily injury because of extreme physical pain and protracted impairment.  See 252

F.Supp.2d at 881-82.  The victim had become pregnant as a result of the rape.  See id. at 882.  It

explained that the victim suffered immediate extreme physical pain as a result of her head being

jammed or banged against the car door during the attack.  See id. at 881; United States v. Guy, 282

F.3d at 992.  It also found that the victim told the defendant he was hurting her, and cried and bled

during the rape.  See United States v. Guy, 282 F.Supp. 2d at 881.

The district court in United States v. Guy also found that, in addition to the "immediate

physical pain, [the victim], also suffered longer lasting physical pain as a result of her rape."  Id.

The victim also suffered extreme labor pains that was caused in part by the victim's "small-body

frame that was still growing and unable to cope with the stress of child birth." Id.  It also found that

the victim's labor pains were enhanced because she suffered a complete tear of her perianum, which

caused severe hemorrhaging and that she would have died from it without medical intervention.  See

id.  The court found a direct correlation between the defendant's criminal activity and the victim's

extreme physical pain, and determined that a 2-level enhancement for infliction of serious bodily

injury was justified.  See id. at 881-82.

The district court on remand in United States v. Guy also found that the victim suffered protracted impairment of her physical and mental functions.  See id. at 882.  A clinic psychologist testified that  the victim was suffering from posttraumatic stress disorder ("PTSD") from the rape until March of 2001, when she stopped seeking treatment.  United States v. Guy, 282 F.Supp. 2d at 880, 882.  The district court interpreted "the word 'protracted' [as meaning] lengthened, extended or prolonged, but it does not mean permanent or unalterable; thus, evidence that [the victim] suffered from depression and PTSD from late 1999, the date of her assault, to at least March of 2001" was sufficient for it to find serious bodily injury.  Id. at 882.  It also found the victim's pregnancy a physical impairment because it constituted "related nausea and vomiting, exhaustion, hot flashes, back pain, contractions, weight-gain, and other illnesses and discomforts commonly associated with pregnancy."  Id.  It additionally found that the victim was hospitalized as a result of the injuries she sustained from child birth.  See id.  It further found that, even without considering the physical pain caused by pregnancy, the protracted mental impairment, and protracted physical impairment, that her hospitalization alone would be sufficient to warrant a 2-level enhancement for serious bodily injury.  See id.

Ultimately, the Eighth Circuit affirmed the district court's enhancement based upon serious bodily injury:

> We conclude that the extensive findings made by the district court on remand are supported by the evidentiary record and are more than sufficient to justify application of the serious bodily injury enhancement in § 2A3.1(b)(4)(B). The evidence shows that [the victim] suffered extreme physical pain during her labor and delivery which was made difficult by her small frame and resulted in a complete tear of the wall between the vagina and the rectum and severe hemorrhaging. Her depression and PTSD were well documented and lasted from the time of the rape in October 1999 until at least March 2001, constituting a protracted impairment of the function of her mental faculty. Since this evidence and these findings are sufficient

> to support the court's ultimate finding, that as a direct result of [the defendant]'s crime [the victim] suffered serious bodily injury within the meaning of § 1B1.1, we need not consider the other grounds relied on by the district court. We conclude that the district court did not err by applying the enhancement for serious bodily injury.

United States v. Guy, 340 F.3d at 658-659.  The Eighth Circuit reiterated that "[c]ommentary by the Sentencing Commission makes it clear that that provision [USSG § 1B1.1, comment. (n.1(j))] may not be used in sentencing a defendant for criminal sexual abuse if the same conduct that would support the enhancement has already been taken into account in setting the base offense level."  Id. at 657.

In United States v. Randolph Valentino Kills in Water, 293 F.3d 432 (8th Cir. 2002), two defendants forcibly raped the victim, both vaginally and anally.  See id. at 434.  "During the course of the rape, as [the] defendant held [the victim] down, [the] co-defendant bit the victim on her neck, arm and stomach."  Id.  A physical examination of the victim revealed "abrasions and irritation of the vagina, multiple areas of acute disruption of the hymen, and damage to the perianal area."  Id. A year after the attack, the victim attempted suicide and was treated at a psychiatric care facility. See id.  The victim experienced ongoing recurrent nightmares and took medication for them.  See id.  She also was involved in ongoing counseling.  See id.  Under those circumstances, the Eighth Circuit affirmed the district court's enhancement of defendant's sentence for serious bodily injury, which the district court based on the physical injuries that the victim suffered, and on her ongoing psychological problems.  See id. at 436.

There were some cases, before the 1997 amendment of the guideline, discussing enhancement for serious bodily injury under § 2A3.1(b)(4)(B) based on psychological injury alone. See United States v. Scott, 985 F.2d 576 (Table), No. 92-10112, 1993 WL 12495 (9th Cir. Jan. 22, 1993)(stating that "[t]he Guidelines clearly provide that psychological injuries alone qualify as a

type of bodily injury under § 2A3.1(b)(4)(C)" and, "[f]urther, the fact that the victim's psychological harm is taken into account by the custodial relationship enhancement is immaterial for purposes of whether the bodily injury enhancement is appropriate."); United States v. Wallace, 976 F.2d 734 (Table), 1992 WL 233908 (6th Cir. June 19, 1992)(discussing appeal by defendants who were convicted of convictions for transporting a juvenile female across state lines for purposes of sexual assault)(finding "no clear error in the district court's conclusion that the victim has suffered the impairment of a medical faculty or requires medical intervention for her mental ailments" based upon the testimony of the government psychological expert that "there are emotional scars that this child will carry with her for the rest of her life.")(internal quotations omitted).

The courts appear to be eager to apply the enhancement for serious bodily injury in U.S.S.G. § 2A3.1(b)(4)(B) in sexual abuse cases involving extreme physical or psychological trauma.  But the wording on the guidelines appears to preclude an automatic enhancement in all rape cases. Indeed, there appears to be four possibilities when the enhancement is appropriate.

First, the courts could decide that the enhancement for serious bodily injury is not available in a rape case.  The Federal Sentencing Guidelines Handbook states: "However, Application Note 1 provides that serious bodily injury means conduct other than criminal sexual abuse which is already taken into account in the base offense level under subsection (a).  Thus, a court cannot increase the sentence for serious bodily injury for a defendant convicted of criminal sexual abuse." Id. at 241 (citing United States v. Guy, 282 F.3d 991 (8th Cir. 2002)).  While those statements would suggest that the enhancement is never available in a rape case, it would make little sense for the Sentencing Commission to include the enhancement in U.S.S.G. § 2A3.1 if it never should apply. Peshlakai even declined to take the position that the enhancement was never appropriate in an aggravated sexual abuse case.  See Tr. at 68:22-69:20 (Court & Aarons).

The other extreme -- that the enhancement is automatic in every aggravated sexual abuse case -- appears precluded by the additional sentence in Application Note 1 to U.S.S.G. § 2A3.1. The Eighth Circuit's first opinion in <u>United States v. Guy</u> confines this reading. To give effect to the Commission's plain language in the last sentence of Application Note 1, the Court must read it as a limitation on its use.

The difficulty is deciding in what aggravated sexual abuse crimes the enhancement is available and when it is not. Putting aside the factual difficulties in the inquiry, there are at least two possible legal standards. First, the courts could employ the standard whenever the serious bodily injury was caused by conduct that was not involved in the sexual abuse. The competing standard would be that the enhancement applies to injury that arises from the conduct that underlies the criminal sexual abuse, but the pain or injury must post-date or survive the event. While the Court believes that the Eighth Circuit has adopted some variation of this standard that allows an enhancement when the injury arises out of the conduct that gives rise to the sexual abuse, the Court believes -- for four primary reasons -- that the more narrow application and construction is more consistent with the guideline's language.

First, the Court believes that a plain language reading of the guideline would suggest that the Court should enhance the offense level for "injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation" when it is caused by, or arises out of, conduct that did <u>not</u> involve the use of force, or the threat of force, that caused the victim to engage in a sexual act. The Court readily acknowledges that the last sentence of Application Note 1 to § 2A3.1 does not use the phrase "caused by, or arising out of," but the Court believes that is a natural reading of the last sentence. The last sentence is somewhat confusing,

-39-

because it says "'serious bodily injury' means <u>conduct</u> . . . ," U.S.S.G. § 2A3.1, cmt. app. n.1 (emphasis added) while U.S.S.G. §1B1.1 cmt. app. n. (1)(L) defines "'serious bodily injury means <u>injury</u> . . . ." injury is usually not the same as the conduct of the crime, but is caused by the conduct of the crime.  Nevertheless, the last sentence of U.S.S.G. § 2A3.1, cmt. app. n.1's focus on conduct is instructive.  The language appears to exclude from the Court's consideration -- for purposes of application of the enhancement -- "conduct" that constitutes the criminal sexual abuse.  It is therefore logical that serious bodily injury does not mean injury that is the result of the sexual abuse alone.

Second, the rule of lenity suggests that the Court employ the more narrow interpretation. <u>See</u> <u>United States v. Timber</u>, 232 Fed.Appx. 820, 823 (10th Cir. 2007)("It is true, when there are two rational readings of the law, one harsher than the other, the courts are to choose the harsher only when Congress has made its intentions clear."); <u>United States v. Randall</u>, 472 F.3d 763, 766 (10th Cir. 2006) ("Where a Sentencing Guideline is ambiguous, the rule of lenity requires the court to interpret it in favor of criminal defendants. Nevertheless, this rule applies only where there is a grievous ambiguity or uncertainty in the language and structure of a provision.")(internal citations and quotations omitted).  "The rule of lenity requires courts to interpret ambiguous statutes, including the Sentencing Guidelines, in favor of criminal defendants."  <u>United States v. Gay</u>, 240 F.3d 1222, 1232 (10th Cir. 2001).  Thus, not only is the narrow construction more consistent with the language used in the last sentence of U.S.S.G. § 2A3.1 cmt. app. n. 1, it also comports with the rule of lenity.

Third, the Eighth Circuit's application of the enhancement would appear to have no limits. A victim in a rape case can almost always testify convincingly to extreme psychological pain and suffering, extreme physical harm in the rape, and long-lasting effects.  The Eighth Circuit's

statement appears to, in effect, make the enhancement automatic as long as the district court makes

extensive factual findings about the long-term effects of the sexual abuse.

Fourth, the Eighth Circuit's interpretation puts courts in the difficult position of trying to

come up with a base line for injury in a rape and giving the enhancement only when the incident

exceeds that "average" or "run-of-the-mill" or "normal" injury.  For the victim and the court, the

rape in each case involves a serious injury.  The Court should not have to tell any victim that his or

her rape did not result in as serious an injury as another.

The more narrow construction leaves the enhancement for injuries that arise out of the

incident or conduct that are not part of the sexual abuse.  U.S.S.G. §§ 1B1.3. that defines the

relevant offense conduct as:

> (1)(A) all acts and omissions committed, aided, abetted, counseled, commanded,
> induced, procured, or willfully caused by the defendant; and
>
> * * * *
>
> (3) all harm that resulted from the acts and omissions specified in subsections (a)(1)
> and (a)(2) above, and all harm that was the object of such acts and omissions; and
>
> (4) any other information specified in the applicable guideline.

U.S.S.G. §§ 1B1.3. For example, if the defendant stabs or shoots the victim after the sex act, the

enhancement would apply.  But if the rape caused the harm, the base offense level already covers

that harm.

## F.   ABDUCTION.

U.S.S.G.§ 2A3.1(b)(5) authorizes a 4-level increase if the victim was abducted.  See id.

"Abducted" means that a victim was forced to accompany an offender to a different location.

U.S.S.G. § 1B1.1, cmt., app. n.1(A) ("'Abducted' means that a victim was forced to accompany an

offender to a different location.  For example, a bank robber's forcing a bank teller from the bank

into a getaway car would constitute an abduction."). See United States v. Randolph Valentino Kills in Water, 293 F.3d at 437 (affirming district court's enhancement of defendant's sentence based upon a finding of abduction).  In United States v. Randolph Valentino Kills in Water, the Eighth Circuit affirmed a district court's enhancement based upon abduction even though the victim voluntarily accompanied the defendant to the trailer, because the district court made a specific factual finding that, "although the victim was not forced to accompany [the] defendant to the trailer, [the] defendant forced her inside the trailer where the rape occurred." 293 F.3d at 437.  The district court also found that the defendant used force to get the victim inside the trailer, including "chasing her, picking her up by the waist, dragging her to the trailer, and lifting her up stairs and inside the trailer, despite her resistance."  Id.  Thus, the district  court did not err in determining that the defendant's behavior constituted an abduction within the meaning of U.S.S.G. § 1B1, cmt., app. n.1(A).  The Eighth Circuit agreed that, when the victim "was physically forced to another, physically close location where her ability to escape was greatly impaired" and where "the defendant's ability to isolate the victim inside the trailer certainly increased the likelihood of harm to the victim, as the victim's escape was impeded and she was brutally raped once inside the trailer," the 4-level sentencing enhancement for abduction was authorized under U.S.S.G. § 2A3.1(b)(5). United States v. Randolph Valentino Kills in Water, 293 F.3d at 437.  See United States v. Kavo, 128 Fed. Appx. 447, 451-52 (6th Cir. 2005) (holding abduction occurred within the meaning of U.S.S.G. § 2A3.1(b)(5) when the defendant physically carried the victim against her wishes from the main floor of his home to his basement bedroom because it gave the defendant a better chance to complete his crime than "if he had remained in the immediate area where his sister was sleeping and could have been summoned to assist the victim."); United States v. Mix, 77 Fed. Appx. 986, 990 (9th Cir. 2003) (upholding district court's enhancement for abduction when the defendant "forced

his victim at knifepoint into a back room to continue the assault.").

In United States v. Kavo, the Sixth Circuit decided the enhancement for abduction was appropriate, because the reason that` the defendant moved the victim was "because his sister was on the first level, [and] one can assume that the chances of an assault by force increased substantially when they were in another location in the house where nobody else was present."  128 Fed.Appx. at 451.  The Sixth Circuit agreed "with the district court's decision that the movement of the victim increased the likelihood of harm and offered [the defendant] a better chance to consummate his crime."  Id. See United States v. Young, 50 Fed.Appx. 334 (8th Cir. 2002)(holding that abduction enhancement was applicable where a defendant saw a woman he knew walking past and "called after her and began walking with her down the road. [The Defendant] then forcibly pulled the woman into a friend's empty house, held her down, and raped her.").

## G.   DIVERSIONARY SENTENCES OR CONDITIONAL DISCHARGES.

"Diversion from the judicial process without a finding of guilt (e.g. deferred prosecution) is not counted."  U.S.S.G. § 4A1.2(f).  Further, the guideline explains that "[a] diversionary disposition resulting from a finding or admission of guilt, or a plea of nolo contendere, in a judicial proceeding is counted as a sentence under § 4A1.1(c) even if a conviction is not formally entered, except that diversion from juvenile court is not counted."  U.S.S.G. § 4A1.2(f). United States v. Porter, 51 F.Supp.2d 1168, 1169 (D.Kan. 1999), explains that:

> A diversionary disposition resulting from a finding or admission of guilt, or a plea of nolo contendere, in a judicial proceeding is counted as a sentence under § 4A1.1(c), even if a conviction is not formally entered, except that diversion from juvenile court is not counted. In short, the exclusion depends on what stage at which diversion occurs. Application Note 3 to U.S.S.G. § 4A1.1 emphasizes that "[a] diversionary disposition is counted only where there is a finding or admission of guilt in a judicial proceeding.  Application Note 9 to U.S.S.G. 4A1.2(f) reiterates the same point: "Section A1.2(f) requires counting prior adult diversionary dispositions if they involved a judicial determination of guilt or an admission of guilt in open

court. This reflects a policy that defendants who receive the benefit of a
rehabilitative sentence and continue to commit crimes should not be treated with
further leniency." In sum, a diversionary disposition will not count as a prior
sentence unless it has involved an adjudication of guilt, as in a finding or admission
of guilt or a plea of nolo contendere in a judicial proceeding.

Id. (internal citations omitted).  See United States v. Gorman, 312 F.3d 1159, 1167 (10th Cir. 2002)

(surveying other circuits' law and finding that the Eighth Circuit, Sixth Circuit, and Second Circuit

all concluded that a conditional discharge sentence could be counted as a criminal justice sentence

and affirming the district court's addition of two points to the defendant's criminal history for an

abeyance, which was similar to both deferred sentences and conditional discharge sentences, under

U.S.S.G. § 4A1.1(d)); United States v. Rollins, 97 Fed.Appx. 577, 579 (6th Cir. 2004)(internal

quotations omitted)(holding that the district court correctly included the defendant's conviction for

driving without insurance in its calculation of his criminal history, even though the state court only

imposed  a two-year conditional discharge . . . -- a sentence that [the Sixth Circuit] has previously

determined to be the functional equivalent of unsupervised probation" because "'conditional

discharge' and 'unsupervised probation' alike constitute 'probation' for purposes of §

4A1.2(c)(1)."); United States v. Strong, 40 Fed.Appx. 214, 219 (7th Cir. 2002)(upholding a district

court's addition of two additional points to the defendant's criminal history under us added two

more points under § 4A1.1(d), for a total of six based a term of conditional discharge that the

defendant was serving during the time of the drug trafficking conspiracy that he pled to).

## H.    UNCOUNSELED MISDEMEANORS.

In felony cases, the Constitution requires that an indigent defendant be offered appointed

counsel unless that right is intelligently and competently waived.  See Gideon v. Wainwright, 372

U.S. 335, 342-43 (1963).  Convictions gained in violation of Gideon cannot be used "either to

support guilt or enhance punishment for another offense."  Burgett v. Texas, 389 U.S. 109, 115

(1967).  In Burgett v. Texas, the Supreme Court of the United States held that a prior conviction could not be used for sentence enhancement because the record of the earlier proceeding did not show that the defendant had waived his right to counsel.  See id. at 114.

Peshlakai argues that, in Strachan v. Army Clemency and Parole Bd., 151 F.3d 1308 (10th Cir. 1998), the Tenth Circuit, relying on Burgett v. Texas, held that, "if a record of conviction does not indicate representation by counsel where so entitled, or an effective waiver, the defendant enjoys a presumption that he was denied his right to counsel."  151 F.3d at 1311.  Any subsequent sentence that was based in part on a prior invalid conviction must be set aside.  See United States v. Tucker, 404 U.S. 443, 447-449 (1972). In United States v. Cruz-Alcala, 338 F.3d 1194 (10th Cir. 2003), however, the Tenth Circuit noted that, "[o]nce the prosecution establishes the existence of a conviction, the defendant must prove by a preponderance that the conviction was constitutionally infirm."  338 F.3d at 1197 (internal quotations omitted).  That is, a "presumption of regularity attaches to final judgments, even when the question is waiver of constitutional rights."  Id. (internal quotations omitted).

The Tenth Circuit continued to explain in United States v. Cruz-Alcala that, "[t]o the extent that Strachan v. Army Clemency & Parole Bd. . . . stated otherwise, it failed to follow circuit precedent."  United States v. Cruz-Alcala, 338 F.3d at 1197.  In United States v. Bush, 405 F.3d 909 (10th Cir. 2005), the Tenth Circuit noted that Strachan v. Army Clemency & Parole Bd. "[f]ailed to follow earlier circuit precedent  . . . . Moreover, in Parke v. Raley, the Supreme Court [of the United States] limited its decision in Burgett by noting that at the time of the previous conviction at issue in Burgett v. Texas, a state criminal defendant's right to counsel had not yet been established." 405 F.3d at 922  n.7.  In United States v. Concha, 294 F.3d 1248 (10th Cir. 2002), the defendant relied upon to argue his previous "convictions could not support an upward departure

-45-

because the government did not establish they were fairly obtained. In particular, Mr. Concha

contends the government failed to show he was represented by counsel with respect to five of them."

Id. at 1253.  The Tenth Circuit explained:

> The guidelines specifically provide that, in calculating a defendant's criminal history
> score, sentences resulting from convictions that "have been ruled constitutionally
> invalid in a prior case are not to be counted." U.S.S.G. § 4A1.2, comment. (n.6).
> Significantly, however, the application note further provides that "[n]onetheless, the
> criminal conduct underlying any conviction that is not counted in the criminal
> history score may be considered pursuant to § 4A1.3 (Adequacy of Criminal History
> Category).
>
> * * * *
>
> This guideline renders misplaced Mr. Concha's reliance upon Strachan v. Army
> Clemency & Parole Bd. 151 F.3d 1308 (10th Cir.1998). In that case, we held an
> invalid conviction could not support the forfeiture of street time upon revocation of
> parole, a matter not subject to the sentencing guidelines. Here, to the contrary, the
> use of conduct underlying an invalid conviction is specifically permitted during
> sentencing in determining whether to depart on the basis of inadequate criminal
> history.

Id. at 1253-54; id. at 1254 n. 5.

Furthermore, these constitutional protections for waiver of counsel have been extended to

misdemeanor cases where the court imposed any sentence of actual, probated, or suspended

incarceration.  See Alabama v. Shelton, 535 U.S. 654, 661-62 (2002); Argersinger v. Hamlin, 407

U.S. 25, 33-37 (1972)(holding that misdemeanor status is irrelevant if conviction leads to

imprisonment even for a brief period).  In Scott v. Illinois, 440 U.S. 367 (1979), the Supreme Court

held that the Sixth and Fourteenth Amendments do not entitle an indigent defendant to trial counsel

where he was convicted of theft and fined $50 after a bench trial.  See 440 U.S. at 367, 368.  The

Supreme Court of Illinois declined to extend  Argersinger v. Hamlin to the defendant where he was

"charged with a statutory offense for which imprisonment upon conviction is authorized but not

actually imposed upon the defendant."  Id. at 369.  The Supreme Court affirmed explaining: "Even

were the matter <u>res</u> <u>nova</u>, we believe that the central premise of <u>Argersinger</u> -- that actual imprisonment is a penalty different in kind from fines or the mere threat of imprisonment is a penalty different in kind from fines or the mere threat of imprisonment -- is eminently sound and warrants adoption of actual imprisonment as the line defining the constitutional right to appointment of counsel."  <u>Scott v. Illinois</u>, 440 U.S. at 373.

In <u>Nichols v. United States</u>, 511 U.S. 738 (1994), the Supreme Court held, "consistent with the Sixth and Fourteenth Amendments of the Constitution, that an uncounseled misdemeanor valid under <u>Scott[ v. Illinois</u>, 440 U.S. 367 (1979)] because no prison term was imposed, is also valid when used to enhance punishment at a subsequent conviction."   511 U.S. at 748. Uncounseled misdemeanor convictions, in which the court imposes incarceration, are not counted.  <u>See</u> <u>United States v. Cousins</u>, 455 F.3d 1116, 1126 (10th Cir. 2006)("Clarifying the scope of <u>Gideon</u>, the Court later held that an indigent defendant must be appointed counsel in any criminal prosecution, regardless of its classification as a misdemeanor or felony, 'that actually leads to imprisonment even for a brief period . . . .")(quoting <u>Argersinger v. Hamlin</u>, 407 U.S. at 33).

The Tenth Circuit in <u>United States v. Cousins</u>, followed the Supreme Court's decision in <u>Alabama v. Shelton</u>.  <u>See</u> 455 F.3d at 1126.  In <u>United States v. Cousins</u>, the defendant, Cousins, disputed the PSR's criminal history calculation.   Cousins argued that his prior misdemeanor convictions for receiving stolen property should not have been included in calculating his criminal history, because he was not represented by counsel and thus counting that conviction violated his Sixth Amendment right to counsel. <u>See</u> 455 F.3d at 1121, 1126-27.

> [Cousins] was convicted of the misdemeanor offense of receiving stolen goods, pursuant to a guilty plea.  The written judgment reflects a sentence of 30 days in jail or a $500 fine.  The word "suspended" is circled.  A provision for one month unsupervised probation is crossed out.  The Government stipulated that the South Carolina court effectively imposed a suspended sentence requiring [Cousins] to pay

the $500 fine or, if he did not, to spend 30 days in jail.  There is also no dispute that [Cousins] was not represented by an attorney during these proceedings.

Id. at 1124 n. 5.  The Tenth Circuit reasoned that Cousin's case was "analogous to Shelton in the sense that the sentence imposed by the South Carolina court was essentially a suspended sentence: [E]ither Defendant paid the $500 fine or he went to jail for 30 days."  Id. at 1126.   The Tenth Circuit reasoned that, in Alabama v. Shelton, the Supreme Court "held that a suspended sentence that may end up in actual deprivation of a person's liberty fit under the Argersinger-Scott 'actual imprisonment' rule and thus entitled the defendant to the benefit of counsel." United States v. Cousins,  455 F.3d at 1126 (quoting Alabama v. Shelton, 535 U.S. at 674).   "Therefore, by depriving [Cousins] of the benefit of counsel, South Carolina appears to have violated [Cousins]' Sixth Amendment rights."  United States v. Cousins,  455 F.3d at 1126. The Tenth Circuit then stated that, "[h]aving concluded that the South Carolina conviction violated [Cousins'] Sixth Amendment rights, we must also conclude that it was error for the district court to use this conviction in calculating Kurt's criminal history category."  Id. at 1127.

On the other hand, there is not a constitutional prohibition against counting all prior misdemeanor convictions in which the defendant has not been afforded counsel.  According to the background note in U.S.S.G. § 4A1.2, prior sentences, not otherwise excluded, are to be counted in the criminal history score.  See U.S.S.G. § 4A1.2, app. n., (backg'd); United States v. Beltran-Maruffo, No. CR 07-0078 JB, 2007 WL 2219416, at *2 (D.N.M. May 7, 2007)(Browning, J.)(quoting U.S.S.G. § 4A1.2)("'Prior sentences, not otherwise excluded, are to be counted in the criminal history score, including uncounseled misdemeanor sentences where imprisonment was not imposed.'")  The criminal history score should include uncounseled misdemeanor sentences where imprisonment was not imposed.

-48-

## I.      TRIBAL COURT CONVICTIONS.

No criminal history points may be counted for tribal court convictions.  See U.S.S.G. §

4A1.2(i)("Sentences resulting from tribal court convictions are not counted, but may be considered

under § 4A1.3 (Adequacy of Criminal History Category).");  Application Note 2 to § 4A1.1 ("[A]

tribal court conviction . . . is not counted.");  United States v. Lonjose, 42 Fed.Appx. 177, 180 (10th

Cir. 2002)("It is undisputed that prior tribal court convictions are not to be counted in calculating

the defendant's initial criminal history category.").   "At times these [tribal court] convictions are

based on uncounseled guilty pleas, entered for the purpose of leaving the jail, and should not be

counted."   Nevertheless, "[t]ribal court sentences not used in computing criminal history category

may provide a valid basis for an upward departure to a higher criminal history category."  United

States v. Waugh, 207 F.3d 1098, 1101 (8th Cir. 2000);  United States v. Yates, 22 F.3d 981, 987

(10th Cir. 1994)

### ANALYSIS

The USPO addressed some of Peshlakai's objections in its Addendum and re-disclosed PSR.

As a result, some became moot or considerably undercut.  Nevertheless, the proposed enhancements

remain as issues for the Court to resolve.

## I.      THE COURT WILL OVERRULE PESHLAKAI'S OBJECTION TO PARAGRAPH 12.

Peshlakai contends that paragraph 12 of the original PSR incorrectly implies that he has not

given his version of the offense in this case.  See Sentencing Memorandum ¶ 18, at 7, filed Sept. 20,

2007 (Doc. 92).  He points out that paragraph 21 of the original PSR contains his version.  See id.

In the re-disclosed PSR, the USPO has inserted Peshlakai's version in paragraph 12 and his

acceptance of responsibility in paragraph 21.   See Addendum to the PSR at 2, disclosed Oct. 16,

-49-

2007.   With those changes, the objection is moot, and the Court will thus overrule the objection.

See Tr. at 5:9-16 (Court & Aarons).

## II.   THE COURT WILL OVERRULE IN PART AND SUSTAIN IN PART PESHLAKAI'S OBJECTIONS TO THE PSR'S CALCULATION OF THE OFFENSE LEVEL.

The Court will overrule Peshlakai's objection to the enhancement for use of force, because the guidelines and controlling case law indicate that it must be applied in an <u>aggravated</u> sexual abuse case. The Court will sustain Peshlakai's objections to the enhancement for serious bodily injury, because the United States has not shown, by a preponderance of the evidence, that the victim's injuries arose out of conduct other than the conduct that constitutes the sexual abuse.  The Court will overrule the objection to the enhancement for abduction, because the United States has shown, by a preponderance of the evidence, that Peshlakai forced the victim to drive to the hill where he sexually abused her.

### A.   THE COURT WILL OVERRULE PESHLAKAI'S "DOUBLE COUNTING" OBJECTION TO THE PSR'S ENHANCEMENT OF THE OFFENSE LEVEL FOR USE OF FORCE.

Peshlakai objects to the application of a 4-level increase, pursuant to U.S.S.G. § 2A3.1(b)(1), for the use of force in paragraph 24.  See Sentencing Memo. ¶ 20, at 7.  The proposed guideline refers to the special offense characteristic of use of force in the statute to which Peshlakai pled.  See 18 U.S.C. § 2241(a); Plea Agreement ¶ 3,  at 2, filed July 19, 2007 (Doc. 88)("The defendant hereby agrees to waive his rights and plead guilty to Counts 1 and 2 of a three-count indictment charging violation of 18 U.S.C. § 1153, that being Crime in Indian Country, and 18 U.S.C. § 2241(a), that being Aggravated Sexual Abuse.").  Peshlakai disputes this 4-level increase as double counting. See Sentencing Memo. ¶ 21, at 7.

Peshlakai contends that the base offense level already takes into account the sexual nature

of the offense and that, therefore, applying a 4-level increase under subsection (b)(1) constitutes double counting.  See id.  Peshlakai argues that, as a matter of law, the high base level for his crime is recognition of the sexual nature of that offense.  "Nothing more was done."  Sentencing Memo. ¶ 27, at 9 (citing United States v. Pearson, 211 F.3d 524, 526 (10th Cir. 2000)).

There is no factual dispute that Peshlakai used force in the commission of the crime.  See Tr. at 60:20-21(Peshlakai)(admitting that he hit Sandra T. with his fists as she described); id. at 61:1-3 (Spiers & Peshlakai)(Peshlakai)(admitting that inserting his penis inside Sandra T. would hurt her).  See also Plea Agreement ¶ 3,  at 2, filed July 19, 2007 (Doc. 88)(noting that Peshlakai pleads guilty to 18 U.S.C. § 2241(a), Aggravated Sexual Abuse); 18 U.S.C. § 2241(a) (aggravated sexual abuse is knowingly causing another person to engage in a sexual act " (1) by using force against that other person; or (2) by threatening or placing that other person in fear that any person will be subjected to death, serious bodily injury, or kidnapping.").  There is sufficient evidence in the record, established by a preponderance of the evidence, that Peshlakai used force against the victim during the federal offense.  See Findings of Fact at ¶¶ 32, 33, 50-71, at 5, 7-8.  The issue is a legal one: whether the a 4-level increase is permissible pursuant to U.S.S.G. § 2A3.1(b)(1) when the crime involves aggravated sexual abuse.  The Tenth Circuit has held that "a four-level upward adjustment is mandatory for all defendants convicted under 18 U.S.C. § 2241."  United States v. Talk ,13 F.3d at 372  (citing United States v. Bordeaux, 997 F.2d 419, 420 (8th Cir. 1993)).  "The Sentencing Commission plainly understands the concept of double counting and expressly forbids it where it is not intended."  United States v. Archdale, 229 F.3d 861, 869 (9th Cir. 2000)(citations omitted).  Here, the Sentencing Commission and the Tenth Circuit have made it clear that, when the offense involves a violation of 18 U.S.C. § 2241(a), they require the 4-level enhancement.  Peshlakai's objection to a 4-level increase under U.S.S.G. § 2A3.1(b)(1) is thus overruled.

**B.** **THE COURT WILL SUSTAIN PESHLAKAI'S "DOUBLE COUNTING" OBJECTION TO THE ENHANCEMENT FOR SERIOUS BODILY INJURY.**

Peshlakai's arguments against enhancement for serious bodily injury are similar to those that he raises on the force enhancement.  Originally, the USPO apparently believed that the serious bodily enhancement applied because it was mandatory like the force enhancement when there was a conviction under 18 U.S.C. § 2241(a), because that was the sole reason that the USPO gave for the enhancement.  See Original PSR ¶ 25, at 7, disclosed Sept. 10, 2007.  In its Addendum, however, the USPO acknowledges that the 2-level increase for serious bodily injury may not be applied "solely on the basis of the defendant's conviction for Aggravated Sexual Abuse."  Addendum, at 4.  Nevertheless, the USPO believes that the 2-level increase is still appropriate, because there are other factors showing that Peshlakai caused serious bodily injury to the victim.  See Addendum, at 4 (citing United States v. Guy, 282 F.3d 991 (8th Cir. 2002), and United States v. Randolph Valentino Kills in Water, 293 F.3d 432 (8th Cir. 2002)).  In the current PSR, the USPO argues that serious bodily injury "is deemed to have occurred if the offense involved conduct constituting criminal sexual abuse under 18 U.S.C. § 2241."  Re-disclosed PSR ¶ 25, at 9.

Peshlakai first makes a factual argument.  Peshlakai argues that, "[w]hile not excusing his conduct, Jane Doe did not suffer 'serious bodily injury' as defined by the Sentencing Guidelines."  Sentencing Memo. ¶ 29, at 10 (quoting U.S.S.G. § 1B1.1 cmt. n.1 (L)).  Peshlakai argues that "she suffered no injury involving extreme physical pain or the protracted impairment of a function of a bodily member, organ, or mental faculty; or requiring medical intervention such as surgery, hospitalization, or physical rehabilitation."  Sentencing Memo. ¶ 29, at 10 (paraphrasing U.S.S.G.

§1B1.1, cmt. app. n.(1)(L)).[6]

Peshlakai also argues that the United States is mistakenly relying upon the application notes to U.S.S.G. § 1B1.1, and "deems that 'serious bodily injury' automatically occurs whenever the offense involves criminal sexual abuse under 18 U.S.C. §§ 2241 and 2242." Sentencing Memo. ¶ 30, at 10. Peshlakai contends that, in this case, there is no distinction between the criminal sexual abuse and the conduct that caused any bodily injury. See Sentencing Memo. ¶ 33, at 11. He asserts that "[s]uch an enhancement would be unreasonable by enhancing the base offense level for conduct identical to that already included in the base offense." Id.

Peshlakai appropriately objects to double counting. Under U.S.S.G. §§ 2A3.1 and §1B1.1, the serious bodily injury enhancement is appropriate for conduct other than the conduct constituting the criminal sexual abuse itself, which already is taken into account in the base offense level. See United States v. Donovan Jones Neha, No. 04-1677, Memorandum Opinion and Order, at 3, filed Feb. 18, 2007 (Doc. 350)(D.N.M. 2007)(Browning, J.). The Eighth Circuit has also found that the serious bodily injury enhancement applies only "if the offender's conduct underlying his conviction

---

[6]In a footnote to his sentencing memorandum, Peshlakai argues that the "government has never given notice as required by due process of any intention to provide objective evidence at the sentencing hearing of serious physical injury, nor has it disclosed the identity or whereabouts of Dane Joe to enable defense counsel to interview her as to any evidence of serious bodily injury apart from her understandably subjective viewpoint." Sentencing Memo. at 10 n.1. At the hearing on this matter, Peshlakai's counsel had no objection to the testimony of the victim, because it was not, in his opinion, objective evidence. See Tr. at 13:18-21 (Aarons). Peshlakai's counsel noted he was prepared to cross-examine her on "what her subjective point of view might be." Tr. at 13:21-22 (Aarons). Peshlakai's counsel also stated that the best process was to hear the evidence, and decide if Peshlakai's concern about notice was moot. See Tr. at 13:8-11 (Aarons). After the testimony was taken, Peshlakai did not make or renew any due process objection; thus any concerns about notice appears moot. Accordingly, the Court need not reach the issue what notice is required of evidence at a sentencing hearing, because, in advance of the hearing and at the hearing, the United States did not offer any third-party evidence on the issue of serious bodily injury, and the defense was afforded an opportunity to cross examine the victim at the hearing.

for another type offense also involved criminal sexual abuse, but not if the conviction is for sexual abuse."  United States v. Guy, 282 F.3d at 996.

Here, all the conduct before and between the two sexual assaults involved the use of force or threat of force to cause the victim to engage in a sexual act.  It is true that the Court could just focus on Peshlakai hitting her in the head, and treat it as unnecessary for the sexual abuse, but at a trial, the Court would have let that evidence in as evidence of force or the threat of force that caused her to engage in the sexual act.  The beating and tackling appears to be the res gestae of the crime, and what lead to the sexual assault.

Moreover, after the second act on the hill, there does not appear to be any conduct that caused the victim's injury.  When that act was done, injury appears to have been complete.  The effects of Peshlakai's conduct may be long-lasting, but the conduct was over and the sexual acts were completed.

Finally, the United States has failed to show, by a preponderance of the evidence that the victim's injury was the result of conduct after, or separate from, what constitutes the sexual abuse.  The United States has made no effort to show how long-term emotional injury was the result of the "other conduct."

THE COURT:           Let me ask you what you think it means when the guidelines say in its note that for purposes of this guideline serious bodily injury means conduct other than criminal sexual abuse, which has already been taken into account in the base offense level under subsection A?  How do you interpret that?  Would you go back and use the harm or pain that was part and parcel of the sexual abuse?

MR. SPIERS:          Yes, Your Honor, because I would submit that . . . -- two things.  One, it's difficult to reconcile that language as just read by the Court, which I believe I understand, as perhaps disqualifying serious bodily injury that is part and parcel of the commission of the use of force that goes into consummating sexual abuse, however –

THE COURT:          You would agree with me that if you just read that statement, it would look
                    like we could not take the extreme physical pain that would go -- that would
                    be part of a rape -- we could not take it into consideration; it's looking for
                    something else.

MR. SPIERS:         No, Your Honor that's not exactly how I would read it.  I would read it my
                    reading of that would mean that in a, under clinical case of, say
                    hypothetically, a defendant makes a you a show of force or and doesn't
                    actually  batter the victim or a defendant takes part of the victim's  clothing
                    and by force relationships their . . . outer garments and their under garments
                    which would be of course observed by the victim . . .  that would be that
                    would be an application use of force . . . .  In that scenario my reading would
                    be that they're -- double counting that would be . . . be prohibited in that case
                    and the sentencing guideline of the increase of offense level for force would
                    be disqualified. However, if the force is extreme and meets the definition  .
                    . . , that analysis, if one of those components is satisfied a substantial risk of
                    death, extreme physical pain, protracted disfigurement or impairment of a
                    mental faculty or physical organ -- if one of those elements were satisfied,
                    then I believe that serious bodily injury would be perfectly acceptable and
                    required in terms of sentencing guideline analysis.

See Tr. at 10:11-11:25 (Court & Spiers). In sum, some of the "conduct" upon which the United

States relies is not "other conduct," but the same conduct that constituted the sexual abuse.  And to

the extent that the United States can point to conduct in the offense that did not constitute the sexual

abuse, the United States has not, by a preponderance of the evidence, linked the other conduct to

specific harm.

        The Court recognizes that, subjectively, Jane Doe believes that she was severely harmed and

injured by Peshlakai's actions.  See Findings of Fact at ¶¶ 49-86, at 6-9.  The Court does not doubt

that she has suffered psychological and physical injury, and Peshlakai does not dispute that there

was harm to her.  The Court finds, however, that the United States has not met its burden of showing

that the physical and psychological injuries she suffered did not arise from Peshlakai's aggravated

sexual abuse of her, but rather was the product of other conduct.  Because the Court finds that, under

U.S.S.G. §§ 2A3.1 and §1B1.1, the enhancement for "serious bodily harm" must be for conduct

separate from the criminal sexual abuse itself, the requirements under those guidelines are not met.

Even if the Court were to employ a more expansive definition of serious bodily injury, the United States has not convinced the Court by a preponderance of the evidence that the broader construction of the enhancement is met in this case.   In the sexual abuse cases where this enhancement has been applied, there was conduct inflicting extreme physical trauma on the victim. See United States v. Randolph Valentino Kills in Water, 293 F.3d 436 (8th Cir. 2002)(affirming enhancement where there were bites, abrasions, and irritation of the vagina, multiple areas of acute disruption of the hymen, damage to the perianal area,  attempted suicide necessitating treatment at a psychiatric care facility, ongoing recurrent nightmares requiring medication, and ongoing counseling); United States v. Guy, 252 F.Supp. 2d 879 (D.N.D.  2003) (applying enhancement where rape resulting in painful pregnancy, PTSD evidenced by testimony by a clinical psychologist, and hospitalization resulting from difficult childbirth).  The United States presented no evidence by medical doctors establishing any permanent physical injuries.  The Court finds that the United States has failed to present, by a preponderance of the evidence, that the victim suffered "protracted impairment of -- a function of a bodily member, organ . . . ." or that her injury required "medical intervention such as surgery, hospitalization, or physical rehabilitation." U.S.S.G. §1B1.1, cmt. app. n.(1)(L).

The more difficult issue is whether she suffered "extreme physical pain."  While there was certainly physical pain, and she believed the pain was extreme -- and pain is always to some degree subjective -- the Court does not believe the pain was extreme  as the guidelines require.  While Peshlakai hit her in the head, she was not rendered unconscious.  She continued to function at a high level throughout the entire incident. Moreover, as noted above, any physical pain is too closely associated with the conduct that constituted the sexual abuse for the Court to segregate out certain

conduct and resulting pain, and base an enhancement on that conduct and resulting pain.

The most difficult factual issue is whether there was an impairment of mental faculty. The Tenth Circuit has not directly addressed whether mental impairment or suffering alone is sufficient to warrant an enhancement for serious bodily injury. See United States v. Lanzi, 933 F.2d at 827. The Court has some concern that "impairment of a . . . mental faculty" includes psychological impact alone. U.S.S.G. §1B1.1, cmt. app. n.(1)(L). The language "mental faculty" would suggest that the impairment may have to be part of the brain or a faculty that the brain performs. Nonetheless, some courts have applied the enhancement to psychological injury alone. See United States v. Scott, 985 F.2d 576 (Table), 1993 WL 12495, at *6 (9th Cir. Jan. 22, 1993)("The Guidelines clearly provide that psychological injuries alone qualify as a type of bodily injury under § 2A3.1(b)(4)(C)."); United States v. Wallace, 976 F.2d 734 (Table), 1992 WL 233908, at *4-5 (6th Cir. June 19, 1992)(finding no clear error in the district court's conclusion that the victim has suffered the impairment of a mental faculty, or requires medical intervention for her mental ailments" when the government's psychological expert examined the victim and concluded that she had suffered a permanent ailment).

In any case, assuming -- without deciding -- that "protracted impairment of a function of a . . . mental faculty" includes psychological impact alone, the Court believes that the United States has shown, by a preponderance of the evidence, that Sandra T. has suffered "protracted impairment of a function of a . . . mental faculty." U.S.S.G. § 1B1.1 cmt. app. n.1(L). See Findings of Fact ¶¶ 77-89, at 9-10. "[T]he word "protracted" means lengthened, extended or prolonged, but it does not mean permanent or unalterable." United States v. Guy, 282 F.Supp. 2d at 882. Peshlakai attacked Sandra T. in June of 2005. See Findings of Fact ¶ 1, at 3. Sandra T. testified at the October 16, 2007 evidentiary hearing that she still was suffering mentally and seeing a therapist. See Findings of Fact

¶¶ 77-89, at 9-10.  That is over two years of psychological harm.  <u>See</u> <u>United States v. Guy</u>, 282 F.Supp. 2d at 882 (holding that mental impairment from late 1999 to March of 2001 was protracted); <u>United States v. Wallace</u>, 976 F.2d 734 (Table), 1992 WL 233908, at *4-5 finding impairment of a mental faculty because the government's psychological expert concluded the victim had suffered a permanent ailment and had "emotional scars that [she] carry with her for the rest of her life.").

Although the Court concludes that -- if psychological harm alone is enough to constitute serious bodily harm, a legal issue that the Court need not decide -- there was protracted impairment of a mental faculty, the United States has made no effort to link it to conduct other than the conduct constituting the sexual abuse.  The mental suffering does not appear to be significantly different than that most, if not all, rape victims suffer.  If the Court were to enhance the offense level for serious bodily harm under the facts and circumstances of this case, it would be hard to imagine a rape case where it would not be available.  Accordingly, the Court will sustain Peshlakai's objection to the 2-level enhancement for serious bodily harm.

### C.   THE COURT WILL OVERRULE THE OBJECTION TO THE PSR'S ENHANCEMENT TO THE OFFENSE LEVEL BECAUSE OF ABDUCTION.

Peshlakai abducted the victim within the meaning of U.S.S.G. § 2A3.1(b)(5) and U.S.S.G. § 1B1.1, cmt., app. n.1(A).  When Peshlakai forced Sandra T. to drive her vehicle up the road to the hill, where he sexually abused her, <u>see</u> Findings of Fact ¶ 33, 35, at 5, he abducted her.  At the point where Sandra T. Drove her vehicle up the road to the hill, Peshlakai had already taken away her car keys, <u>see</u> Findings of Fact ¶ 26, at 5, tackled her, <u>see</u> Findings of Fact ¶ 33, at 5, and hit her in the head as she lay on her stomach, <u>see</u> Findings of Fact ¶ 34, at 5. After these events, Sandra T. told Peshlakai: "I'll do whatever you want.  Tell me what you want me to do.  I'll do whatever you want, just don't hit me any more."  Findings of Fact ¶ 35, at 6.  It was at that point that Peshlakai returned

her car keys to her, see Findings of Fact ¶ 36, at 6, and directed her to drive up to the hill, see Findings of Fact ¶¶ 37, 38, at 6.  They initially passed the place where Peshlakai wanted Sandra T. to stop her car. See Findings of Fact ¶ 40, at 6.  Once they arrived at the hill, Peshlakai directed Sandra T. to get in the backseat of her car, where he sexually abused her.  See Findings of Fact  ¶¶ 43, 44, at 6.

Abduction occurs if the perpetrator moves the victim from one location to another within a close geographic space.  See United States v. Randolph Valentino Kills in Water, 293 F.3d at 437 (affirming a finding of abduction when the defendants carried victim inside trailer, even though victim voluntarily accompanied the defendants to the trailer); United States v. Kavo, 128 Fed. Appx. at 451-52 (holding abduction occurred the defendant physically carried the victim against her wishes from the main floor of his home to his basement bedroom.); United States v. Mix, 77 Fed. Appx. at  990 (holding abduction occurred when the defendant "forced his victim at knifepoint into a back room to continue the assault.").   "Abducted" also may be broader than physical movement, or movement by gunpoint, or knifepoint; the comment to the guidelines indicate that "abducted" means that a victim was "forced" to accompany an offender to a different location.  See U.S.S.G. § 1B1.1 cmt. app. n.1(A) ("'Abducted' means that a victim was forced to accompany an offender to a different location. For example, a bank robber's forcing a bank teller from the bank into a getaway car would constitute an abduction.").  It would appear to be a factual issue whether the victim was "forced" to go somewhere, and does not require the defendant himself to bodily move the victim. See United States v. Saknikent, 30 F.3d 1012, 1013-14 (8th Cir. 1994)("Also, 'forced' does not necessarily imply a physical assault. To 'force' means to compel 'by physical, moral, or intellectual means,' or 'to impose' or 'to win one's way.' Webster's Seventh New Collegiate Dictionary 326 (1970). 'Force' can also mean 'constraining power, compulsion; strength directed to an end.' Black's

Law Dictionary 644 (6th ed. 1990).").

The Court recognizes that most of the other cases where the court gave an enhancement for abduction involved situations where the defendant physically moved the victim.  Here, on the other hand, Peshlakai told her where to go -- to the hill -- and she went.  Regardless of how Peshlakai got her to the hill, the Court believes she was forced.  Given the beating and abuse that she had experienced, the Court can reasonably conclude that she was forced to the hill.  There is no indication that she would have gone to the hill if Peshlakai had not told her to do so.  And there is nothing in the guidelines or in the case law that suggests she has to be physically handled before there is an abduction. "'Abducted' means that a victim was forced to accompany an offender to a different location." U.S.S.G. §1B1.1, app. n. 1(A).  It is not reasonable to conclude that the law requires her to experience another beating before it finds she is being forced to move to a location she does not want to go.  Court will overrule Peshlakai's objection to the enhancement for abduction.

III.   **THE COURT WILL OVERRULE THE REMAINING OBJECTIONS.**

Peshlakai also raises objections to his criminal history and to information about another crime that has been recently dismissed.  As to the criminal history category, the USPO has amended its PSR, thus mooting or significantly undercutting the strength of his objections.  As to the objection to the information on the recently dismissed state case against Peshlakai, the Court will leave it in the PSR, but will not rely upon it in its sentencing decision given the confusing nature of his confession in that case and given it was recently dismissed.

A.   **THE COURT WILL OVERRULE PESHLAKAI'S OBJECTIONS TO THE USPO'S CALCULATION OF HIS CRIMINAL HISTORY POINTS.**

Peshlakai raises two objections to his criminal history.  First, he objects to the Shoplifting

conviction because he did not have any counsel, he allegedly received a conditional discharge, and he allegedly received incarceration.  Second, he objects to any criminal points being assigned for a tribal court conviction.

### 1.      The Court Will Overrule the Objection to Paragraph 34.

Peshlakai objects to a criminal history point being assessed to his conviction for Shoplifting listed in paragraph 34.  See Sentencing Memo. ¶ 2, at 1; PSR ¶ 34, at 11 (citing San Juan County Magistrate Court, Aztec, New Mexico, Case No. M R 2001-596).  Peshlakai argues that the PSR "penalized him one (1) criminal history point for a misdemeanor shoplifting charge in which he was supposedly incarcerated."  Sentencing Memo. ¶ 2, at 1, citing Original PSR ¶ 34, at 1.  Peshlakai argues that this conviction should not be counted, because it was an uncounseled misdemeanor for which he was sentenced to jail.  See Sentencing Memo. ¶ 6, at 2.  Peshlakai further argues that a non-lawyer magistrate sentenced him to jail without attorney representation.  See id.; PSR ¶ 34, at 11 ("arrested on warrant"); id. ("attorney representation is unknown").  Then, somewhat inconsistently, he contends that a review of that case indicates someone else, not Peshlakai, received a drug conditional discharge for possession of less than one ounce of marijuana.  See Sentencing Memo. ¶ 3, at 1.

After reviewing Peshlakai's conviction for Shoplifting listed in paragraph 34, the Court concludes that the assessment of 1 criminal history point is appropriate and warranted.  This case is unlike the situation in United States v. Cousin, 455 F.3d 1116 (10th Cir. 2006), because no suspended sentence was imposed in the Peshlakai's Shoplifting case.  See PSR ¶ 34, at 11.  The sentence in the Shoplifting case is countable, because even though it was an uncounseled misdemeanor, no term of imprisonment was imposed as part of the sentence.  See U.S.S.G. § 4A1.2, app. n., (backg'd).  The sentence is not otherwise excluded.

It is unclear why Peshlakai makes reference to a conditional discharge with regard to his conviction and states that a diversion from the judicial process without a finding of guilt is not, pursuant to U.S.S.G. § 4A1.2(f), counted.  See Sentencing Memo. ¶¶ 4-5, at 2.  The sentence in the Shoplifting case was not a diversionary sentence.  See PSR ¶ 34, at 11.  Accordingly, the Court will overrule Peshlakai's objection to paragraph 34.

**2.**     **The Court Will Overrule the Objection to Paragraph 36 as Moot.**

Peshlakai objects to a criminal history point being assessed for his conviction for Unauthorized Use of a Vehicle listed in paragraph 36, because the conviction occurred in a tribal court and, therefore, is not, pursuant to U.S.S.G. § 4A1.2(i), excludable.  See Sentencing Memo. ¶¶ 8-13, at 4-5.  The use of the tribal conviction causes concern, but the USPO has correctly amended the re-disclosed PSR to eliminate the point assigned to this conviction.  See Addendum, at 1-2; PSR ¶ 36, at 12-13.  The Court will thus overrule the objection to paragraph 36.

**3.**     **The Total Criminal History Points is 1.**

Because the Court has overruled one objection as moot, Peshlakai's criminal history cannot be category II.  Instead, the correct total of criminal history points is 1, which establishes a criminal history category of I.  See U.S.S.G. Chapter 5, Part A; PSR ¶ 37, at 13.  The Court will overrule any objection to paragraph 37 of the re-disclosed PSR.

**B.     THE COURT WILL OVERRULE PESHLAKAI'S OBJECTION TO PARAGRAPH 42.**

Peshlakai contends that reference to the dormant state case is highly misleading and inflammatory.  See Sentencing Memo. ¶¶ 14-17, at 5-7.  Peshlakai contends that its inclusion into this PSR is designed to prejudice the Court.  See id. ¶ 17, at 7.  The USPO denies that its intent was to prejudice the Court by including this material.  See Addendum, at 2.

-62-

The reason that the state court case was not prosecuted is not readily apparent.  It should remain a part of the PSR, because Peshlakai was arrested as a suspect in the case, and it can be included under "Other Arrests" in the PSR's criminal history section.  Addendum, at 2.  <u>See</u> 18 U.S.C. § 3661 ("No limitation shall be placed on the information concerning the background, character, and conduct of a person convicted of an offense which a court of the United States may receive and consider for the purpose of imposing an appropriate sentence.").  Accordingly, the Court will overrule the objection to paragraph 42.[7]

**IT IS ORDERED** that the objections in Peshlakai's Sentencing Memorandum are sustained in part and overruled in part.  The Court overrules Peshlakai's objections to ¶ 12 of the PSR  as moot. The Court overrules Peshlakai's objections to the PSR's overall calculation of his criminal offense level under U.S.S.G. §§ 2A3.1(b)(1), 2A3.1(b)(5), and 1B1.1, cmt., app. n.1(A), but sustains Peshlakai's objection to the enhancement using U.S.S.G. §§ 2A3.1(b)(4)(B) and 1B1.1, cmt. app. n.(1)(L).  The Court overrules Peshlakai's objection to ¶ 34 of the PSR.  It also overrules Peshlakai's objection to ¶ 36 of the PSR as moot.  The Court overrules Peshlakai's objection to ¶ 42 of the PSR.

_____
UNITED STATES DISTRICT JUDGE

*Counsel:*

Paul H. Spiers
  Assistant United States Attorney
United States Attorney's Office
Albuquerque, New Mexico

     *Attorneys for the Plaintiff*

---

[7]The Court will address Peshlakai's <u>Booker</u> arguments at the continued sentencing hearing and in a separate memorandum opinion and order.

Stephen D. Aarons
Aarons Law Firm PC
Santa Fe, New Mexico

*Attorneys for the Defendant*